Aaron Johnstun (USB #13070)
JOHNSTUN LAW, LLC
1411 West 1250 South, Third Floor
Orem, Utah 84058
Office: (801) 376-7523
Fax: (801) 655-5102
Email: aaron@utah-law.net
Attorney for Plaintiffs

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TERRY WEBB, KRISTIE WEBB, TRAVIS WEBB, KRISTY WEBB, KAMBERLY WEBB and LOUISE WEBB;<br><br>**Plaintiffs,**<br><br>vs.<br><br>KRISTOFFER A. KROHN; STEPHEN R. EARL; REAL ESTATE INVESTORS CLUB, LLC d/b/a REIC; REAL ESTATE INVESTORS CLUB OF SALT LAKE COUNTY, LLC; REAL ESTATE INVESTORS CLUB OF UTAH COUNTY, LLC; THE COMPANIES, LLC; JDK INVESTMENT GROUP, LLC; REO NATIONAL, LLC; THE REAL ESTATE FIRM, LLC; THE REAL ESTATE FIRM OF SALT LAKE COUNTY, LLC; THE REAL ESTATE FIRM OF UTAH COUNTY, LLC; STRATEGIC LENDING, LLC; STRATEGIC LENDING OF UTAH COUNTY, LLC; THE PROPERTY MANAGEMENT COMPANY, LLC; THE FINANCIAL FIRM, LLC; BETA REAL ESTATE HOLDINGS, L.P.; GAMMA REAL ESTATE HOLDINGS, L.P.; and JOHN DOES 1-10,<br><br>**Defendants.** | **COMPLAINT**<br><br><br>Case No.  2:10-cv-01269<br><br>Judge Clark Waddoups |

INTRODUCTION

This case begins with lurid promises of investment returns "too good to be true." It ends as other fraudulent investment schemes with the Defendants failing to deliver as promised with one excuse after another as to why the Plaintiffs' money cannot be returned. The Defendants' fraudulent investment scheme is accomplished through an elaborate network of individuals and corporate entities with the intent being to promote, offer and sell securities to the public while escaping securities regulation and compliance. Not only have the Defendants refused to return the Plaintiffs' investment funds, the Defendants have threatened the Plaintiffs with retaliatory litigation for bringing to light the Defendants' unlawful conduct, including federal and state securities violations. The Defendants' unlawful securities violations perpetrated upon unsuspecting victims are ongoing, aggravating, unabashed and unremorseful. After providing the Defendants with numerous opportunities to resolve this matter outside litigation, the Plaintiffs are left with no choice but to seek relief from this Court.

JURISDICTION, VENUE & PARTIES

1. This Court has subject matter and personal jurisdiction over each of the parties herein. Jurisdiction in this Court is further proper pursuant to 28 USC § 1331, Section 20(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v(a), and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa.

2. Venue is proper pursuant to U.C.A. 1953 § 78B-3-301, *et seq*. Venue is further proper in this Court pursuant to 28 USC § 1391, Section 20(a) of the Securities Act, 15 U.S.C. § 77 v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3. The plaintiffs are each domiciled and residents of the State of Utah.

4.   The defendant Kristoffer A. Krohn ("Krohn"), is a resident of Utah County, Utah and may be served with process by any lawful personal service including personal service at his residence located at 1491 East 1110 North, Orem, Utah 84097.

5.   The defendant Stephen R. Earl ("Earl") is a resident of Utah County, Utah and may be served with process by any lawful personal service including personal service at his residence located at 216 East Ridge Road, Orem, Utah 84057.

6.   The defendant Real Estate Investors Club, LLC a/k/a REIC ("REIC") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Kristoffer Krohn at 1070 East 800 North, Orem, Utah 84057.

7.   The defendant Real Estate Investors Club of Salt Lake County, LLC d/b/a REIC ("REIC Salt Lake") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

8.   The defendant Real Estate Investors Club of Utah County, LLC d/b/a REIC ("REIC Utah") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

9.   The defendant The Companies, LLC ("The Companies") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

10. The defendant JDK Investment Group, LLC ("JDK") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of

business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Brad Jacobsen at 3165 E. Millrock Dr. Suite 160, Salt Lake City, Utah 84121.

11. The defendant REO National, LLC ("REO Nat'l") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Kristoffer A Krohn at 1080 East 800 North, Orem, Utah 84097.

12. The defendant The Real Estate Firm, LLC ("TREF") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1080 East 800 North, Orem, Utah 84057 or its registered agent Kristoffer Krohn at the same address.

13. The defendant The Real Estate Firm of Salt Lake County, LLC ("TREFS") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

14. The defendant The Real Estate Firm of Utah County, LLC ("TREFU") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

15. The defendant Strategic Lending, LLC ("Strategic") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1080 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

16. The defendant Strategic Lending of Utah County, LLC ("Strategic UC") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1080 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

17. The defendant The Property Management Company, LLC ("TPMC") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

18. The defendant The Financial Firm, LLC ("TFF") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Brad Jacobsen at 3165 E. Millrock Dr. Suite 160, Salt Lake City, Utah 84121.

19. The defendant Beta Real Estate Holdings, L.P. ("BREH") is a Delaware limited partnership and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent The Corporation Company at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

20. The defendant Gamma Real Estate Holdings, L.P. ("GREH") is a Delaware limited partnership and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent The Corporation Company at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

21. The defendants John Does 1-10 are unidentified executives, officers and managers of the above business defendants having knowledge and participated in the unlawful conduct described herein. Such individuals may as information becomes available be named as defendants through an amended complaint.

<u>THE GENERAL SCHEME</u>

22. Based out of Orem, Utah, the Defendants operate a national securities fraud scheme using means of interstate commerce ("Scheme"). In particular, the Defendants promote, offer and sell securities through investment transactions managed or stock in entities owned by the Defendants. Such business entities in turn purchase sight unseen bank owned foreclosure homes ("REO" or "Real Estate Owned") purportedly purchased from banks at up to 90% discounts for resale to the public and to be managed by the Defendants. The investments promoted, offered and sold to the public by the Defendants are made with representations of investment returns exceeding 100%, using infallible investment strategies and backed by the Defendants' team of experienced investment managers and companies.

23. In reality, investors like the Plaintiffs unwittingly purchase nothing more than highly speculative unregistered securities based on blue sky promises with little to no material disclosures. In return for their investment (in the hundreds of thousands) investors like the Plaintiffs receive little more than a stock certificate printed on card stock paper from a desktop printer. The Defendants' securities violations through misstatements and omissions are no better illustrated than by the fact they purport to give investors "stock" in limited liability companies in return for the investment, a matter of simple business entity impossibility.

24. The Defendants' unlawful investment scheme is based out of Orem, Utah under the name of Real Estate Investors Club, LLC or REIC. Connected with REIC are numerous affiliate

companies organized and owned by Krohn and Earl and operating under the umbrella of REIC. The ultimate purpose for each affiliate company is soliciting and managing the investments promoted, offered and sold to the public by Krohn, Earl and REIC. These companies include, but are not limited to, Real Estate Investors Club of Salt Lake, LLC, Real Estate Investors Club of Utah County, LLC, The Companies, LLC, JDK Investment Group, LLC, REO National, LLC, The Real Estate Firm, LLC, The Real Estate Firm of Salt Lake County, LLC, The Real Estate Firm of Utah County, LLC, Strategic Lending, LLC, Strategic Lending of Utah County, LLC, The Property Management Company, LLC, The Financial Firm, LLC, Beta Real Estate Holdings, L.P., and Gamma Real Estate Holdings, L.P. The use of the word "Club" within the foregoing names is deceptive in that these entities are actually used to solicit and funnel investor money to the parent company, REIC, as well as the individual defendants Krohn, Earl and John Does 1-10.

25. The individual defendants Krohn and Earl directly or indirectly own and manage each of the defendant companies. There are also a number of individuals acting as controlling executives, officers or managers for REIC with knowledge and participation in the investment solicitations. These individuals are believed to have full knowledge and participation in the promotion, offer, and sale of unregistered securities to investors alongside Krohn, Earl, REIC and other defendants. These individuals are identified as John Does 1-10.

26. Generally speaking, the unlawful investment activities by the Defendants take one of two forms. Both ultimately lead to the unlawful promotion, offer and sale of unregistered securities to investors.

27. The first form of unlawful investment activity begins with the promotion of "free" investing seminars titled "Eat and Grow Rich" offered by REIC. Such free seminars are

promoted through incessant radio and web marketing in which investors are offered the chance to attend free seminars in which they will be taught investment strategies used during the Great Depression by individuals like John Rockefeller to become fabulously wealthy. In reality, the free seminars are "teasers" intended to lure investors into expensive courses and personal coaching. Investors are told the paid courses and personal coaching are necessary to receive the education they need to be successful at real estate investing. The content purports to contain real estate investing strategies that, in the Defendants' words, "generates the greatest profits than any other strategy…[and] proven to work in every market, *especially* down markets." The Defendants call this strategy the "Strait Path" real estate investment system. Strait Path is purported to have originated from Krohn and generally made available through Krohn's self-published book, "The Strait Path to Real Estate."

28. An integral component of REIC's investor education is the existence of an in-house "Power Team" purporting to do all the work for investors. The REIC "Power Team" consists of a real estate division, strategic lending division, property management division, REO national division and a financial firm. In other words, all the necessary components to find and manage an investor's investments are provided by REIC. Such management is done for a fee with a profit expectation and commonly done jointly between the REIC investor and REIC, Krohn, Earl or John Does 1-10. As REIC's most recent radio advertisement states: "[REIC] does all the work for you." REIC's emphasizes this point on its website, www.reicglobal.com/strait-path-investment-program/, as follows:

> "[W]e make it easy for you. You don't need to be a real estate expert because we provide the expertise—from finding properties to financing to maximizing profits, we're with you every step of the way."

This affiliation of corporate entities created by Krohn and Earl known as the REIC "Power Team" effectively constitutes an attempt to circumvent securities regulation and compliance through a shield of corporate formality. The "Power Team" is represented to consist of Real Estate Investment Companies (REIC), The Real Estate Firm, LLC, Strategic Lending, LLC, The Property Management Company, LLC, REO National, LLC, and The Financial Firm, LLC.

29. More pernicious though is that part of REIC's training involves teaching REIC investors to promote, offer and sell unregistered investments to the public at large. This is again done through REIC's Power Team and, more specifically, retirement division. Essentially, REIC investors are trained to solicit third-party investors to roll IRAs and 401Ks into self-directed IRAs in which the REIC investor manages and invests in "cash flow" assets sold through REIC's Power Team. The transfer of the third-party investor's IRA and 401K is then facilitated through REIC's in house "Power Team" with the investment being directly managed through REIC's Power Team for a fee. The investments sold to the third-party investor includes real estate assets sold by REIC. In this way, REIC acts as a market maker thereby offloading its own investment assets and obligations to first and second tier investors while still managing the investments for a fee.

30. This investment structure was officially announced on May 6, 2010 at an REIC investor meeting dubbed "The REIC 2010 Annual Wealth Summit" held at the Downtown Marriot in Provo, Utah. This new investment offers to REIC investors the opportunity to purchase cash flow investment properties directly from REIC which are then in turn completely managed by REIC's "Power Team" for a monthly fee. REIC's investors in turn then promote, offer and sell interests in such investments to the public under the same management structure.

Complaint

31. A second investment activity at REIC involves the direct promotion, offer and sale of stock in business entities owned and managed by the Defendants. These include, but not limited to, JDK Investment Groups, LLC, The Companies, LLC, Beta Real Estate Holdings, L.P. and Gamma Real Estate Holdings, L.P. Such entities are owned and managed by Krohn, Earl and REIC for the purpose of purchasing and reselling REO pools from banks through investor funds. Such investor funds are acquired through investment offerings offered to the public. Krohn, Earl, REIC and the REIC Power Team then act as the manager of the business entities and underlying investments. As the Defendants put it, investors are allowed to invest in REIC "through bulk purchase of 'REOs,' or bank-owned properties, which are made available to clients of our investment program."

32. While the Defendants tell investors they will own the REOs purchased, the investors who purchase investments from the Defendants in this way actually purchase stock in the business entities created and owned by the Defendants. Contrary to what they are led to believe, investors do not obtain title and own the REO homes their investment funds are purportedly used to purchase. Instead, the Defendants acquire legal ownership and exclusively manage the investment on the investors' behalf with little to no accountability. Further, the investors are led to believe they are receiving legitimate stock in a company. In reality, the stock offered is to limited liability companies. In other words, a basic corporate impossibility.

33. The Defendants generally tell or lead the investors to believe that upon investing they will experience an instant spike in personal net worth and asset equity. Investors are further promised that they are participating in infallible investment strategies used during the great depression by the Rockefeller family to become the first billionaires. In reality, the investors are

purchasing nothing more than speculative unregistered securities in which they do not hold title, have no control and receive little if any material disclosures.

34. Despite the Defendants' promises of fabulous wealth and infallible strategy, the reality is the REOs actually purchased are located in dilapidated neighborhoods, often next to boarded up homes in economically depressed regions. The REOs are purchased relatively sight unseen without any meaningful inspection, title check or investment vetting. What is promoted as deeply discounted homes ready to resell for big returns are actually homes largely unsellable and located in low-rent/high crime areas. The net result being the investors in the Defendants' scheme end up with speculative and illiquid investments without any forewarning of what they are actually receiving in return for their investment.

35. When unable to sell the REOs, the Defendants back-peddle by telling investors they have learned new strategies that are even more profitable and powerful and require a four to five year commitment. The adjusted time frame represents the Defendants' hope based strategy that national real estate markets will return to earlier time periods.

36. In addition to using investor funds to purchase investment assets, REIC also uses investor funds and subsequent asset cash flow to subsidize the defendants' operating costs and the personal investments of individual defendants like Krohn. Such use of investor proceeds is not disclosed to prospective and existing investors.

37. Investors, especially the earliest invested, are further told that their shareholder value will increase exponentially as REIC signs up new investors through future capital raising activities. This representation of increased shareholder value based on new investor funding gives color and resemblance of a Ponzi Scheme.

38. The Defendants generally lure investors in with promises of creating $2 million in personal wealth over a ten year period if investors but follow Krohn's "Strait Path" investing system. Other investors are lured with promises they can double their investment in less than a year's time. Investors are promised they can regularly find and purchase REOs at 90% below fair market value. In reality, investors are investing in REIC and in turn REIC uses the investor proceeds with little to no accountability as to use and allocation. The REOs purchased by REIC with investor funds are purchased at fair market value creating illiquid assets that REIC in turn offloads to first and second tier investors.

39. To create the illusion of investment legitimacy, the Defendants saturate its marketing with client testimonials. In reality many of these client testimonials are from the family members, friends and employees of REIC. There is no disclosure by REIC that such testimonials are family members, friends or employees. Other manufactured testimonials are as REIC puts it, "harvested" from REIC investors early on and before the investor's actual intermediate and long-term results take shape. The Defendants' client results in reality are a trail of insolvencies through over-leveraged finances, negative cash-flow, un-rentable properties, tenant damaged properties, foreclosures and bankruptcies premised on the hope that better real estate days will return. Such client failures unfortunately include close family members and friends of the Defendants.

40. The Defendants' investment method is best characterized as invest first, worry about securities compliance later, if at all. Prospective investors are given little, if any, information necessary to make an informed decision regarding the promoted investment. Specifically, investors are not given a "private placement memorandum" ("PPM") or information customarily associated with legitimate full disclosures. The information withheld from prospective investors

includes, but, not limited to: biographical history of REIC and its affiliates; executive bios and compensation; relevant personal and corporate bankruptcies; status of past or pending income tax issues; past or threatened litigation; risk analysis associated with investment; investment portfolio; local, regional, national and global market analysis; debt leverage status and analysis of the investments and REIC and its affiliates; detailed investment strategy; investment sourcing, screening, vetting and due diligence process; historical investment performance; historical profitability performance of REIC and its affiliates; investment performance benchmarks; investment commitment timeframe; risks associated with loss, illiquidity, condition of asset, preexisting liens and clouded title, etc.; geographic specific investment timeframe; articles of organization or incorporation, operating agreement or bylaws; investment agreements; accredited investor verification and questionnaire; investment registration documents; analysis of prospective income tax consequences; scope, status and identity of other investor involvement; possibility of investment dilution through additional investor involvement or debt issuance; right or lack thereof to prevent investment dilution; ability for assets acquired investor proceeds to be sold or transferred; detailed historical financial performance of REIC and its affiliates including profit and loss reports; ownership of title; investor role or lack thereof in investment and corporate management decisions; investment description; risk disclosures related to investing in REIC and its affiliates; risk disclosures related to investing in real estate based assets; investment debt to equity ratio analysis; debt to equity ratio of REIC and its affiliates; corporate governance structure of REIC and its affiliates; detailed executive and management biographies, including past executive and management experience, background and education, and role in investment process; corporate biography of REIC and its affiliates including philosophy, history, strategy and competitive advantages; costs associated with investment in real estate; corporate operating

costs associated with REIC and its affiliates; past capital raising activities of REIC and its affiliates; and possibility of additional capital raising activities of REIC and its affiliates;

41. The Defendants' investments are promoted to the public at large in the intermountain region through radio, internet and mail marketing. Recently, the defendants have broadened their outreach to investors through a national marketing campaign.

42. The main individual players are the defendants Kristoffer Krohn, Stephen Earl and other executives, officers and managers of REIC and its affiliates identified as John Does 1-10. **Krohn** is represented as REIC's founder and president. By all accounts he is the face of REIC's advertising and investment representations. He is also the purported originator of the "Strait Path" real estate investing system and author of the self-published book, "The Strait Path to Real Estate Wealth." Krohn along with REIC represent the Strait Path strategy as proven to work in any market, especially down markets, lacks risk and is the singular best real estate strategy ever devised. Krohn represents to personally own more than 400 properties placing his net worth between $4 million conservatively to more than $60 million. Krohn describes himself as having owned numerous successful investment companies and presents himself to the public as an investor, mentor and financial liberator. On April 12, 2010, Krohn was named a defendant in the Utah Fourth District Court, Case No. 108200272, for failure to return REIC membership fees to an investor. On May 25, 2010 a bench trial was held with judgment entered against Krohn in the amount of $4,401.65. Krohn was also named as a defendant in the Utah Fourth District Court by the Utah State Tax Commission, Case No. 076406521, for a tax lien. On October 15, 2007, judgment was entered against Krohn in the amount of $946.54. Krohn along with Earl are co-owners of Life Mastery Systems, LLC, a Utah company. According to the Utah Better Business Bureau, Life Mastery Systems, LLC has an "F" rating, the lowest possible due to a failure to

respond to customer complaints. **Earl** is Krohn's business partner and Chief Executive Officer of REIC. Earl is purported to have founded Pro System Painting Company and grew this company into one of the largest residential painting contracting companies in Utah County. Earl oversees the daily operations of REIC, marketing, client management and investment management of REIC. Earl is at all times with knowledge and control over the promotion, offer and sale of investments to the public. In addition to Krohn and Earl, REIC employees a number of executives, officers and managers that handle and control marketing, client management and investment management. These individuals are identified as John Does 1-10.

43. The Plaintiffs have withheld naming certain individuals like John Sorenson and David Kaplar as defendants until further discovery shows they had direct knowledge and control over the securities violations described herein. However, as discussed below, it is generally believed these individuals had knowledge of the investment offerings made to the Plaintiffs and had some control and ownership of the business entities in which the Plaintiffs were purported to receive stock ownership in exchange for their investment. Upon the outcome of such discovery, the Plaintiffs may amend this complaint to include these and similar individuals.

44. The corporate players enabling the Defendants' scheme include the defendant Real Estate Investors Club, LLC d/b/a REIC along with its affiliate and alter ego corporate entities Real Estate Investors Club of Salt Lake County, LLC d/b/a REIC, Real Estate Investors Club of Utah County, LLC d/b/a REIC, The Companies, LLC and JDK Investment Group, LLC, REO National, LLC, The Real Estate Firm, LLC, The Real Estate Firm of Salt Lake County, LLC, The Real Estate Firm of Utah County, LLC, The Property Management Company, LLC, The Financial Firm, LLC, Beta Real Estate Holdings, L.P., and Gamma Real Estate Holdings, L.P. Each of these entities are either directly or indirectly owned, operated and controlled by Krohn

Complaint

and Earl. **Real Estate Investors Club, LLC** ("REIC") was registered with the State of Utah on October 26, 2007 by Krohn and with Krohn to act as the sole owner and manager. It is believed Krohn and Earl now own and manage REIC together. Starting on May 27, 2009, Mike Krohn, the Chief Financial Officer for REIC, submitted multiple "Form D" exempt offering notices for The Companies and Beta Real Estate Holdings with the United States Securities and Exchange Commission and the Utah Division of Securities, *infra*. REIC is the corporate face for the Defendants under which marketing, management, investor education and investment promotion take place. Specifically, REIC represents to own a "Power Team" consisting of Real Estate Investment Companies, The Real Estate Firm, LLC, Strategic Lending, LLC, The Property Management Company, LLC, REO National, LLC and The Financial Firm, LLC. REIC represents its "Power Team" to find and manage every aspect of an REIC investor's investment.

**Real Estate Investors Club of Utah County, LLC** ("REIC Utah") was registered with the State of Utah on July 25, 2008 with Krohn and Earl to act as the owners and managers. REIC Utah is a subsidiary of its parent company REIC. **Real Estate Investors Club of Salt Lake County, LLC** ("REIC Salt Lake") was registered with the State of Utah on March 12, 2009 with Krohn and Earl to act as the owners and managers. REIC Salt Lake is a subsidiary of its parent company REIC. **The Real Estate Firm** ("TREF") was registered with the State of Utah on January 10, 2008 with Krohn and Benjamin Gale to act as the owners and managers. TREF is REIC's in-house real estate brokerage and purports to locate, research, analyze and negotiate the purchase of deeply discounted properties in an investor's local market. **The Real Estate Firm of Salt Lake County, LLC** ("REFS") was registered with the State of Utah on Mary 12, 2009 with Krohn and Earl to act as the owners and managers. REFS is a subsidiary of its parent company REIC. **The Real Estate Firm of Utah County, LLC** ("REFU") was registered with the State of

Utah on July 25, 2008 with Krohn and Earl to act as the owners and managers. REFU is a subsidiary of its parent company REIC. **Strategic Lending, LLC** ("Strategic") was registered with the State of Utah on March 10, 2004 with Sean Whalen to act as the owner and manager. On or about July 30, 2008 Krohn and Earl were added as the sole owners and managers. Strategic is REIC's in-house lender which purports to use a proprietary finance formula maximizing an investor's ability to finance multiple homes. Specifically, Strategic obtains financing for REIC's investors to leverage and purchase the maximum amount of real estate investments, including investments acquired directly from REIC. **Strategic Lending of Utah County** ("SLUC") was registered with the State of Utah on July 25, 2008 with Krohn and Earl to act as the owners and managers. **The Real Estate Firm** ("TREF") was registered with the State of Utah on January 10, 2008 with Krohn and Benjamin Gale to act as the owners and managers. TREF is REIC's in-house real estate brokerage and purports to locate, research, analyze and negotiate the purchase of deeply discounted properties in an investor's local market. This is done for a management fee. **The Property Management Company** ("TPMC") was registered with the State of Utah on July 29, 2008 with Krohn and Earl to act as the owners and managers. TPMC is purported to execute REIC's "Compassionate Financing" program. Compassionate financing basically involves a "rent to own" arrangement through REIC, an REIC investor and property tenant. **REO National, LLC** ("REO Nat'l) was registered with the State of Utah on January 6, 2009 with Krohn to act as the sole owner and manager.  REO Nat'l is a subsidiary of TPMC which purportedly manages REIC REO pools, including, the rental, sale and management of such properties individually. **The Financial Firm** ("TFF") was registered with the State of Utah on September 1, 2009 without disclosure as to ownership but with Earl to act as manager. TFF purports to offer REIC investors a more sophisticated approach to money management and

real estate portfolio, including, an investor's own personal real estate banking system. Specifically, this includes REIC investors soliciting investment funds from third-party investors through self-directed IRAs and 401Ks. **The Companies, LLC** ("The Companies") was registered with the State of Utah on July 25, 2008 with Krohn and Earl to act as owners and managers. On December 30, 2009, Mike Krohn, REIC's Chief Financial Officer, acting for REIC on behalf of The Companies submitted a "Form D – Notice of Exempt Offering of Securities" with the United States Securities and Exchange Commission for the capital amount of $3,963,750. This December 30, 2009 Form D notice represents it as a "New Notice" with the "First Sale Yet to Occur" (7. Type of Filing). Notably, this December 30, 2009 Form D notice occurred nearly seven months after the Plaintiffs interest in JDK was converted to "stock" in The Companies. On January 11, 2010, Mike Krohn, REIC's Chief Financial Officer, acting for REIC on behalf of The Companies submitted a "Form D 15-2 – Rule 506" application with the Utah Division of Securities for the capital amount of $3,963,750. On April 28, 2010, Mike Krohn, REIC's Chief Financial Officer, acting for REIC on behalf of The Companies submitted an amended "Form D – Notice of Exempt Offering of Securities" to the United States Securities and Exchange Commission. The amended Form D submitted by Krohn requests an exemption under Rule 506 for an offering up to $6,629,980 with $362,724 actually raised. Prior to the Plaintiffs' Complaint, disclosure of this offering has not been made to any of REIC's existing or prospective investors. The Companies was registered for the express purpose of promoting, offering, and selling securities to the public at large through stock or pooled interests in bulk REOs. Such public securities offerings include the investment offering made to the Plaintiffs in May 2009 by the Defendants. In this transaction the Plaintiffs were purported to receive such "stock" ownership in The Companies in exchange for converting their interest in JDK

Investment Group, LLC and the REO pool transaction. Krohn compared this event to "buying the kitchen that made the pies." Prior to the Plaintiffs' Complaint, disclosure of this offering has not been disclosed to the public. In a letter dated March 9, 2010 from Earl to the Plaintiffs and other investors, it is represented that The Companies is the flagship company under which all other companies, including REIC, are owned. Perhaps a technical reality, this representation runs contrary to the Defendants' marketing and branding. **JDK Investment Group, LLC** ("JDK") was registered with the State of Utah on April 21, 2008 with Krohn, John Sorensen and Dave Kaplar to act as owners and managers. JDK was registered for the express purpose of soliciting investor funds from the public by REIC to invest in REO pools in exchange for "stock." Notably, JDK like The Companies is a limited liability company and incapable of issuing stock. The Defendants represented to the Plaintiffs they were receiving "stock" ownership in exchange for their investment in REIC and the Fannie Mae REO transaction. **Beta Real Estate Holdings, L.P.** was registered with the State of Delaware on May 15, 2009 with one or more of the Defendants believed to be the general partners and owners. On May 27, 2009, Mike Krohn, the Chief Financial Officer for REIC, submitted a "Form D-Notice of Exempt Offering of Securities" to the United States Securities and Exchange Commission. The Form D submitted by Krohn requests an exemption under Rule 506 for an offering up to $9,800,000. Prior to the Plaintiffs' Complaint, disclosure of this offering has not been disclosed to the public. **Gamma Real Estate Holdings, L.P.** was registered with the State of Delaware on August 7, 2009 with one or more of the Defendants believed to be the general partners. On January 1, 2010, Mike Krohn, the Chief Financial Officer for REIC, submitted a "Form D-Notice of Exempt Offering of Securities" to the United States Securities and Exchange Commission. The Form D submitted by Krohn

requests an exemption under Rule 506 for an offering up to $9,800,000. Prior to the Plaintiffs' Complaint, disclosure of this offering has not been disclosed to the public.

45. The recent federal and state capital raising activities under Reg D Rule 506 by the elaborate network of companies owned by Krohn, Earl, and REIC totals no less than $30,193,730. Containing strict investor qualification, disclosures, and marketing prohibitions, the frequency of such offerings gives rise to serious concerns relating to the Defendants' past and current capital raising activities. On December 8, 2010, REIC publicly announced the United States Securities and Exchange Commission was conducting an investigation into the securities activities of REIC and its affiliates.

46. The substance of REIC's unlawful blue sky investment activity is best stated at its web homepage, www.reicglobabl.com, as follows:

> "The economic sky is falling and you'd better run for cover and settle for dismal returns, right? Wrong!"

> "For wise investors, the current economy offers the best real estate investment opportunities since the Great Depression. Severely discounted real estate is *everywhere*, and we help our investors track it down and snatch it up in bulk. While others are cowering, we're dancing in the rain in this recession."

While the Defendants happily "dance" in the current recession, its investors do not.

### Facts Particular to Terry and Kristie Webb ("Terry" or "Kristie")

47. Terry and Kristie first learned about REIC, Krohn, Earl and other defendants from their son Travis in mid-April 2008.

48. After being told by Travis REIC was looking for investors to invest in deeply discounted homes, they agreed to meet with Krohn to learn more.

49. On or about April 18, 2008, Terry and Kristie met with Krohn at Krohn's REIC office located at 1070 East 800 North, Orem, Utah 84057 to be pitched the Fannie Mae REO

investment transaction. Also in attendance at the pitch meeting were Travis Webb and Kristy Webb and another prospective investor identified as Dan Johnson.

50. The parties at the April 18, 2008 were told by Krohn that he had a friend named John Sorenson with an inside connection to Fannie Mae. Krohn explained that through Sorenson he had learned Fannie Mae was in the process of liquidating hundreds of homes at up to 90% discounts below fair market value and Krohn needed to raise two to three million in investor funds within a few days to purchase the Fannie Mae REOs in bulk. Krohn went on to explain that his REO investment strategy was used during the great depression by the Rockefeller family to become fabulously wealthy. Krohn further represented that Terry and Kristie's investment in the Fannie Mae REOs would technically be a stock investment in JDK Investment Group, LLC and would be for no more than a year. Krohn represented that Terry and Kristie would at a minimum double their money. The pitch meeting ended with Krohn telling Terry and Kristie they had a day to decide whether they wanted to invest in the Fannie Mae REO transaction.

51. On or about April 26, 2008, Terry and Kristie invested $100,000 by delivering a Cashier's Check in the same amount to REIC, Krohn, and other defendants.

52. At the time of investment Terry and Kristie were not given an LLC operating agreement; nor were they told what percentage of share ownership interest in JDK their investment reflected; nor were they provided an investment contract or any disclosures of material information as to their investment.

53. After a year, Terry and Kristie still had not received their investment back and, other than a 2008 K1 statement indicating a net loss, had not received any information about the Fannie Mae REO transaction. Out of concern they approached the Defendants about their investment status.

54. On April 26, 2009, Terry, Kristie and Travis setup another meeting with Krohn at Krohn's REIC office located 1070 East 800 North, Orem, Utah 84057.

55. At the April 26, 2009 meeting Krohn told them the Fannie Mae REO transaction had not gone as well as he promised, but, that they had made a 28% return (this contradicted their 2008 K1 which reflects a net loss on the year). Krohn further explained that he had learned a new long-term investment method involving the Fannie Mae REOs and would offer Terry and Kristie the opportunity to invest in this new investment transaction on the ground floor. The new investment transaction as Krohn explained it consisted of holding onto REOs purchased from third parties and then fixing the homes up to rent and then eventually resell. Terry and Kristie asked if they could have their original investment back at that time. Krohn said that if they pulled their original investment out at that time they would forfeit the 28% return. Kristie asked Krohn if they could leave their original $100,000 invested with REIC and get back the 28% profit. Krohn refused to accept this arrangement. Instead, Krohn said he would drop the price of stock in The Companies, LLC from $40 per share to $10 per share. Kristie then asked if Krohn could give them $128,000 worth of stock in The Companies, LLC. Krohn replied that they could only receive $100,000 worth of stock in The Companies. This did not make sense to Terry and Kristie and ultimately felt they had little choice but to reinvest in the new transaction. Krohn said this new investment transaction would require a five to eight year commitment. Specifically he told Terry and Kristie that the Defendants would use investment returns through rental income to purchase more properties at deep discounts and then about the two year mark would distribute profits to the investors. To close Terry and Kristie on reinvesting, Krohn used the analogy that in reinvesting Terry and Kristie were "buying the kitchen that made the pies while others down the road would only own the pies made in the kitchen."

Complaint

56. At the prospect of losing the profits they had earned to that point, Terry and Kristie let their original investment remain with the Defendants. This came as a significant hardship since health problems existed in their family and had explained to Krohn the need to get some of their investment back in order to cover such medical expenses.

57. At the time of reinvesting in the Defendants' new REO investment transaction, Terry and Kristie were not given an LLC operating agreement; nor were they told what ownership interest percentage in The Companies their investment reflected; nor were they provided an investment contract or any disclosures of material information as to their investment in REIC. The only thing they received to memorialize their reinvestment was a stock certificate printed on card stock and much later a 2009 K1 statement indicating a loss.

58. After complete lack of communication from the Defendants regarding their reinvestment, Terry and Kristie sent a letter to the Defendants dated November 17, 2010 demanding their investment be returned and outlining the securities violations associated with the investments promoted, offered and sold to Terry and Kristie by the Defendants. In response to the demand letter and subsequent communications, the Defendants have refused to return Terry and Kristie's investment funds and threatened them with a lawsuit for defamation and breach of The Companies operating agreement if the above facts are brought to light.

**Facts Particular to Travis and Kristy Webb ("Travis" or "Kristy")**

59. Travis originally met Krohn through a mutual acquaintance in October 2007. This introduction took place at Krohn's office located 1070 East 800 North, Orem, Utah 84057. At the time, REIC had just been registered by the Defendants. Prior to REIC, Krohn was partnering with investors by using investors' money or credit to purchase real estate assets. Krohn would manage the investment for a fee and upon selling the investment Krohn and the investor would

split the profits. Upon forming REIC, Krohn started consulting with investors and counseling them on how to invest in real estate.

60. At this initial meeting, Travis and Kristy paid Krohn $3,000 to join REIC as "club members." This membership purported to entitle them to coaching from Krohn, access to Krohn's investing team (consisting of Krohn as the game planner, Strategic Lending to finance investments, The Real Estate Firm to find homes, property management). Importantly, REIC and Krohn offered to completely manage, along with other members, Travis and Kristy's investments for a fee split.

61. For the next several months, Travis and Kristy met at Krohn's office for coaching sessions. As part of Krohn's consulting process, Travis and Kristy disclosed sensitive financial information regarding assets, savings and retirement accounts. Krohn advised Travis and Kristy to refinance existing properties in order to create funds. Such funds would then be used to leverage the purchase of more properties. The additional properties under Krohn's strategy to be leased out. Krohn told Travis and Kristy not to worry about whether the additional properties purchased initially had a positive cash flow because over time the property's appreciation would eventually overtake any negative cash flow. How Travis and Kristy would make up for the negative cash flow was not discussed. Travis and Kristy met off and on with REIC concerning their lease-option investments between November 2007 and April 2008

62. On or about April 18, 2008, Travis received an unexpected phone call from Krohn about investing in national real estate deals. Krohn told Travis that he was only letting a few people know about the deal. Krohn also said it would be a really big deal and that only individuals with enough money could invest.

63. As explained by Krohn, the transaction involved purchasing pools of REOs from banks. Krohn emphasized that billionaires like John Rockefeller used this strategy during the Great Depression. Krohn explained to Travis that he learned of the investment through a personal source connected to Fannie Mae named John Sorenson and that he needed to put together about two to three million in investor funds within a week. Krohn stated that investors would own the pooled homes that were purchased by Krohn and the other defendants. The homes to be purchased according to Krohn consisted of two main pools. One pool was located in Ohio and the other in Michigan. In addition to these two main pools, there was also to be a few smaller pools of homes scattered throughout the Midwest. According to Krohn, over three hundred homes were to be purchased. The homes according to Krohn were to be purchased at 82% or more below fair market value.

64. Krohn assured Travis the homes would be inspected by a team of specialized home inspectors consisting of REIC employees. This was to happen within a four day window of marathon inspections in which a few REIC employees would fly out to location and inspect the homes. According to Krohn, based on the expected purchase price in the worst case scenario, investors in the Fannie Mae REO investment transaction would at a minimum double their money and possibly much more. The plan as Krohn stated was to purchase and resell the REOs purchased within nine months. As part of the investment, Krohn told Travis that he would own a percentage of the homes purchased and that he would receive stock in JDK Investment Group, LLC.

65. Krohn asked Travis if he knew of any other investors that might be interested and suggested Travis speak with his family about investing because it was such a good deal.

66. Shortly after this phone call Travis spoke with his family about the investment as described by Krohn. The inspectors purportedly flew out to inspect the homes and returned with a favorable report.

67. On or about April 24, 2008, Travis invested $125,000 with Krohn and other defendants along with the investment of his family members.

68. In early May 2008 Travis contacted Krohn to check if the REO homes had been purchased. Krohn indicated that they had not yet been purchased and that things were taking longer than expected. Krohn also indicated they were only purchasing the Ohio pool of homes because the others contained so many bad homes and also because he did not have enough funds to purchase the other pools. Krohn also indicated that the Ohio pool had some bad homes but that they could sell the junk homes to third-party investors looking to flip homes and could still double the investors' money in doing so. Krohn went on to say that some of the homes were so bad that they were unsellable and would need to be donated to charities like Habitat for Humanity for a deduction.

69. Travis continued to check-in on a monthly basis regarding the investment status. For a few months he was told by Krohn that the defendants were trying to figure things out because there was so much paperwork due to Fannie Mae rules. Travis continued to press Krohn and the defendants for more detailed information and was told they were working on sending out additional details through an email or website content update.

70. In September 2008, Travis contacted Krohn about an update. During this conversation Krohn told Travis that he couldn't answer any more questions because he didn't have time to answer all the investor's questions and that he would send out emails and provide web updates.

71. In early 2009, Travis and Kristy received a K1 statement from REIC relating to the Fannie Mae REO transaction. The 2008 K1 statement showed a loss. When questioned, Krohn told Travis that they adjusted to show a loss for tax purposes but that the investment was in good shape.

72. As time passed, Krohn and the Defendants continued to lower their estimates of investor returns. From the initial discussion with Krohn in April 2008, the profit representations from the Defendants started at 100% and gradually decreased to 70% to 50% to a stated 28% profit in March 2009.

73. On March 26, 2009, Travis went to meet with Krohn again at Krohn's REIC office located at 1070 East 800 North, Orem, Utah 84057 about the Fannie Mae REO investment transaction. In attendance at this meeting were Travis, Terry, Kristie and Krohn. Travis was frustrated because he had not received any updates for a few months and felt this was a sign the investment was not going well. At this point he still had not received any information relating to the individual REO homes purportedly purchased by the Defendants and that any information passed on so far was general and blue sky in nature. Despite the Defendants' blue sky assurances, there was no sign of progress and things appeared to be behind schedule. At this point in time, Travis and his family still had no idea what had been purchased, resold or where their money had gone or been used for.

74. At the March 26, 2009 meeting Krohn admitted that the Fannie Mae REO investment transaction had not gone as planned but that they were still in great shape. He indicated that Travis and his family could get their money back with the 28% profit or they could turn their original principal into stock in "The Companies, LLC" and move to a new plan where he and his family would receive passive income beyond their imagination. The "new plan" as described by

Krohn included a hold pattern in which the REO homes purchased would be fixed up and rented out generating pure cash flow while waiting for the real estate markets to bounce back to former levels. Krohn stated the homes could still be resold for 30% more than they were worth two years ago if they didn't become too attached to passive income.

75.   Krohn went on to state that the new plan would take no more than five to eight years while waiting for the real estate markets to rebound but that in the mean time they would start receiving rental income as soon as they could no longer buy homes at deep discounts. Krohn predicted they would start receiving passive income within two years. All of the income would go towards purchasing more discounted homes so there would be that much greater of a return at end. As Krohn put it, the new deal would provide Travis and Kristy with passive income. This passive income would repay their original investment and then at the end they would still own the original REO homes purchased plus others purchased. At that point, they could keep some or all of the homes purchased and sell the rest.

76. On March 27, 2009 Travis again met with Krohn at Krohn's REIC office in Orem, Utah. In attendance at this meeting were Travis, Kristy, Kamberly, Louise and Krohn. At this meeting Krohn effectively repeated what had been discussed in the meeting the day before, that the Fannie Mae REO investment transaction had not gone well, but, that he had learned a new investment strategy that would provide more passive income than they knew what to do with. Krohn said he would pay their money back with the 28% profit or they could reinvest their original principal in the new investment deal he had in the works.

77. Disappointed the Fannie Mae REO investment transaction had not gone as promised and looking for a way to make the original investment a success, Travis reluctantly agreed to reinvest thinking he had transferred his investment to stock in "The Companies, LLC." A simple stock

certificate printed on card stock is all Travis has received from the defendants concerning his reinvestment in the "new plan."

78. In August 2009, Travis finally received a list of the homes originally purchased. Many of the homes purchased are located in blighted neighborhoods next to boarded up homes and depressed economic regions.

79. Travis and Kristy have never received corporate information relating to any of the corporate defendants. Other than annual K1s, they have never received any detailed information as to their investments or REO homes. Not surprisingly, they have never received any rental income from the Defendants. To date they have no idea if their investment is losing money, whether the Defendants are purchasing more homes, where the investment funds have been allocated or revenue generated from the investment is being applied. In fact, they have no idea if their money is actually invested in the REO pools or funding the Defendants' payroll.

80. On or about July 22, 2010, Travis went to REIC and asked to speak to Krohn about the status of his investment. Travis was referred to Kevin Clayson instead. Clayson essentially told Travis that he needed to be patient and that he would have to speak with Krohn and Earl to get his investment funds back, but that this was unlikely.

81. Shortly after this meeting, Travis and Kristy were at The Home Depot located in Lindon, Utah and ran into Trent Rogers (manager for REIC's REO National division). When asked by Travis and Kristy about the status of the REO pool and new investment in The Companies, Rogers told Travis and Kristy that the investment was going great and that Krohn had a vision for REIC and affiliated companies in which passive income from REIC's investments would support the operating costs of REIC.

82. On or about September 15, 2010 Travis went back to REIC and asked for copies of any investment contract, operating agreement or other documents that would indicate what his obligations to REIC were and his rights. Such information had never been provided to Travis and Kristy. Travis met again with Clayson. Clayson indicated to Travis he would need to come back in to sign paperwork relating to the allocation of his investment in The Companies stock. Clayson also told Travis that while he couldn't give him his investment money back, he could sell Travis properties that were cash-flowing at least $700 a month at a discounted price. Travis suspected these properties represented the same Fannie Mae REO homes his original investment was used to purchase.

83. As of today, Travis' 2009 K1 statement indicates a 12% net loss of his original investment instead of the 28% represented by Krohn. He has never received any passive income. He has no idea what his investment purchased, was used for or allocated to.

84. In October 2010, after Travis and Kristy's real estate investments structured with the assistance of REIC started to unravel, Travis and Kristy met with Krohn to discuss the status of their investments. Krohn's conclusion was for Travis and Kristy to attend "life" coaching to resolve their negative attitudes and broken personalities. Travis and Kristy at Krohn's suggestion paid roughly $8,000 for this life coaching. This "life" coaching takes place through Krohn's company called "Soul Purpose" through Life Mastery Systems, LLC. Essentially, the life coaching redirects an investor's investment failures away from Krohn's Strait Path System to an investor's broken personality. After a few sessions, Travis and Kristy thought the life coaching through Life Mastery Systems, LLC was a complete waste of time and money and ended the sessions.

85. Finally, out of frustration over the complete lack of communication and lack of access to information material to their investment, Travis and Kristy sent a demand letter to REIC and other defendants on November 17, 2010. Their demand was for the return of their investment principal, interest, attorney fees and costs pursuant to Utah Code Ann. § 61-1-22(1)(b) for pre-litigation settlement. Notably, Travis and Kristy's demand was significantly less than that allowed by U.C.A. § 61-1-22. In response to Travis and Kristy's demand letter, the Defendants denied any security offerings or transactions occurred and threatened to counter sue Travis and Kristy for defamation and breach of REIC's operating agreement if they attempted to recover their investment through litigation.

86. On December 8, 2010, a request was sent to the Defendants' to forward all material investment disclosures they believe were provided to Travis and Kristy in association with their investment with REIC. The Defendants' effectively indicated that any such information would be addressed during the discovery process after litigation commenced.

87. In light of the Defendants' absolute resistance to cooperate and refusal to amicably resolve past securities violations, Travis and Kristy are left with no choice but to file this complaint with its attendant costs and expenses.

### Facts Particular to Kamberly Webb ("Kamberly")

88. Kamberly originally learned of REIC, Krohn, Earl and other defendants in mid-April 2008 from Travis. At the time, Kamberly was in San Francisco on vacation. After briefly hearing about REIC and the Fannie Mae REO investment transaction offered by the Defendants, Kamberly received a phone call from her mother saying that if she wanted to invest she had one day to make the decision.

89. Relating to the Fannie Mae REO investment transaction, Kamberly was told the Defendants purchased homes at 82% discounts and then resold the homes at fair market value. Kamberly was told her investment would be for one year and that she would at a minimum double her money.

90. On or about April 24, 2008, she delivered approximately $50,000 to Krohn, Earl and other Defendants through a Cashiers Check. The investment was originally made in exchange for stock in JDK Investment Group, LLC.

91. At the time of investment Kamberly was not given an LLC operating agreement; nor was she told what stock percentage in JDK her investment reflected; nor was she provided an investment contract or any disclosures of material information as to her investment in the Fannie Mae REO transaction, REIC and other defendants, how her money had been invested, the status of investment, properties purchased, condition of title, profit/loss, management fees, investment fees, etc. Nor did she receive, other than a 2008 K1 statement indicating a loss, any updates as to the Fannie Mae REO investment transaction's progress.

92. On April 27, 2009, Kamberly setup a meeting with Krohn at Krohn's office located at 1070 East 800 North, Orem, Utah 84057 to discuss the status of the Fannie Mae REO investment transaction. Kamberly, Travis, Kristy and Louise attended this meeting with Krohn.

93. Krohn expressed his regret that Kamberly was among the guinea pigs relating to the Defendants' Fannie Mae REO investment transaction. At this meeting she was told by Krohn that if she pulled her money out she would only make a 28% return but if she kept the money invested she would as Krohn put it, "own the kitchen that made the pies." Krohn further told Kamberly at this meeting that since doing the Fannie Mae REO investment transaction he had learned new things that could give her along with other investors an even higher rate of return.

Krohn stated that because Kamberly was one of the original investors in the Fannie Mae REO investment transaction that had helped him learn from the first investment, he wanted to offer her an even better deal. This meant as Krohn put it, being an "owner of the kitchen that was producing the pies." Krohn went on to explain the "pies" represented his new version of investments. He further stated that Kamberly wouldn't see her investment returned for five years, but at that time the rate of return would be much higher. As part of the reinvestment, Kamberly's interest in JDK stock was to be converted into The Companies stock.

94. At the time of reinvestment in this new venture, Kamberly was not given an LLC operating agreement; nor was she told the number of shares in The Companies her investment reflected; nor was she provided an investment contract or any disclosures of material information as to her investment in The Companies, REIC and other defendants. The only thing she has received to memorialize her reinvestment is a stock certificate printed on card stock and a 2009 K1 statement indicating a loss.

95. After requesting a return of her investment principal on November 17, 2010, she has been threatened by the Defendants with a defamation and breach of operating agreement lawsuit if these facts are brought to light.

### Facts Particular to Louise Webb ("Louise")

96. Louise first learned of Krohn, REIC and other Defendants in mid-April 2008 through Travis. She was told that Krohn, REIC and its partners purchased homes at 90% discounts and then quickly resold them for fair market value. She was told that Krohn needed investment funds to purchase a pool of foreclosed homes owned by a bank and the homes were being purchased as much as 90% below fair market value. She was also told that the investment would be for less than a year and would double her investment in that time.

97. On or about April 26, 2008, Louise delivered approximately $20,000 to Krohn, Earl and other defendants through a Cashier's Check for the Fannie Mae REO investment transaction. The investment was made in exchange for stock in JDK Investment Group, LLC.

98. At the time of investment Louise was not given an LLC operating agreement; nor was she told prior to investing the number of shares she would receive in JDK; nor was she provided an investment contract or any disclosures of material information as to her investment with Krohn, REIC and other defendants, how her money had been invested, the status of investment, properties purchased, condition of title, profit/loss, management fees, investment fees, etc. Nor did she receive, other than a 2008 K1 statement indicating a loss, any updates as to the investment progress.

99. When the one year mark approached she grew concerned and scheduled a meeting with Krohn at Krohn's REIC office located at 1070 East 800 North, Orem, Utah 84057. This meeting took place on April 27, 2009 and was also attended by Travis, Kristy and Kamberly. Krohn told those present that their original investment was being converted into a bigger one and that if she wanted their original investment back they would forfeit the profits earned to that point. Krohn further told her the new investment deal would probably take two to five years but that they should start seeing monthly dividends in a couple years. She was further told by Krohn that some of the homes that were rentable had been rented and that it wouldn't take long to pay back their investment through profit sharing in rent proceeds. Krohn referenced the Great Depression and how the Rockefellers became wealthy buying discounted properties.

100.      At the time of reinvestment in this new venture (The Companies), Louise was not given an LLC operating agreement; nor was she told the number of shares in The Companies her investment reflected; nor was she provided an investment contract or any disclosures of material

information as to her investment in REIC. The only thing she has received to memorialize her reinvestment is a stock certificate printed on card stock and a 2009 K1 statement indicating a loss.

101.    On May 6, 2010, Louise attended an investor meeting hosted by REIC and other defendants at the Downtown Provo, Utah Marriot. Terry attended with Louise. At this meeting Krohn, Earl, Tyler Bennet (President of REIC's Strategic Lending) and other REIC executives and managers presented a "new and exciting" REO investment strategy. As presented, this new strategy consisted of buying REO homes already fixed up from third parties and then selling them back to REIC's investors thereby enabling them to make 20% annual returns. It is believed these homes were the same REO homes originally purchased by the Defendants using the Plaintiffs' investment funds invested in the Fannie Mae REO transaction.

102.    To date, Louise has never received any profit sharing and has not had her investment returned. After making demand for the return of her investment funds, the Defendants have threatened her with a defamation and breach of operating agreement lawsuit for bringing these facts to light.

COUNT I
FEDERAL SECURITIES VIOLATIONS

103.    The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 102 as set forth herein.

104.    The Defendants have engaged in the unlawful offer, sale and promotion of unregistered securities using fraudulent misrepresentations, misstatements of material facts, and omissions of material facts through means of interstate commerce in violation of the federal 1933

Securities Act ("Securities Act"), 1934 Exchange Act ("Exchange Act") and rules promulgated by the United States Securities & Exchange Commission ("SEC").

**(Security)**

105.     Under the Securities Act, Exchange Act and rules promulgated by the SEC, a "security" among other things means an investment transaction where a profit expectation to come from the managerial efforts of a third party exists. The investments promoted, offered and sold to the Plaintiffs by the Defendants gave rise to a profit expectation to come from the Defendants' managerial efforts constituting a "security" as this term is defined and applied under the Securities Act, Exchange Act and rules promulgated by the SEC.

**(Fraudulent Statements; Misstatements of Material Fact; Omissions of Material Fact)**

106.     Under the Securities Act, a party commits a violation when a party promotes, offers or sells a security through a prospectus or oral communication and which includes an untrue statement of material fact or omits to state a material fact necessary to make the statement not misleading. *E.g.,* 15 U.S.C. § 77a, *et seq.* Further under the Securities Act, a party also commits a violation when they (1) employ any device, scheme, or artifice to defraud; (2) obtains money or property by means of any untrue statement of material fact or omission of a material fact necessary to make the statement(s) not misleading; or (3) engages in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser. *I.d.*

107.     Under the Exchange Act, it is unlawful for a party in connection with the purchase or sale of a registered or unregistered security to use any manipulative or deceptive device in contravention to any rule(s) promulgated by the SEC. *E.g.,* 15 U.S.C. § 78a, *et seq.*

Under one such rule, 10b-5 promulgated by the SEC, it is a violation for any party in connection with the purchase or sale of any security using interstate commerce or the mail from (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting a statement of material fact necessary to make the statement not misleading; or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. *E.g.,* 17 C.F.R. § 240.10b-5.

108.     The Defendants have violated the Securities Act and Exchange Act by employing fraudulent and deceptive devices, offered fraudulent misrepresentations, offered material misstatements of fact and omitted material facts in association with the promotion, offer and sale of securities using means or instruments of transportation or communication in interstate commerce or by use of the mail, directly or indirectly.

109.     The Defendants' use of fraudulent or deceptive devices, fraudulent misrepresentations and material misstatements of fact in violation of the Securities Act and Exchange Act are, but not limited to, as follows:

    a.   In mid-April 2008, in a phone call initiated by Krohn to Travis Webb, the Plaintiffs were pitched an investment in bulk Fannie Mae REO pools purchased at 90% discounts below fair market values. This representation was patently false. The homes actually purchased were in dilapidated conditions and located in economically depressed regions. In reality the 90% discount valuation represented by Krohn was based on estimates from at least two years earlier in dramatically different real estate market conditions. To this day Krohn, Earl, REIC and other defendants continue

to represent to prospective investors they regularly purchase real estate at 90% discounts below current fair market value.

b. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented that the investors in the Fannie Mae REOs would at a minimum double their money in less than a year's time. This blue sky representation was and is patently untrue. The Plaintiffs' investment in the Fannie Mae REOs has gone from one letdown to another. The Defendants have made one excuse after, have held the Plaintiffs' investment funds hostage for more than two years, and have recently refused to return their money with the threat of litigation against the Plaintiffs if they exercise their rights under securities laws to recover their investment.

c. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented that investors in the Fannie Mae REOs would own the individual homes. This representation was patently untrue. The Plaintiffs have never individually held title to the Fannie Mae REOs purportedly purchased by the Defendants. The Plaintiffs did not receive a list of the homes purportedly purchased until early 2010 upon receiving their 2009 K1 statements from The Companies.

d. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented the prospective Fannie Mae REOs would receive a thorough inspection. This representation was patently untrue. Shortly before investing, REIC sent a handful of its employees to inspect hundreds of homes across at least three states within a four day window. This

Complaint

window would have included travel from Utah to Ohio, Michigan and other Midwest states. In other words, it is a practical impossibility for the defendants to have inspected all of the foreclosed homes under consideration. In reality, the Defendants purchased the homes largely sight unseen hoping that the percentage of homes in good condition would outweigh any homes in unsellable condition. This investment vetting method was not disclosed to the Plaintiffs.

e.   In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented the Fannie Mae REOs would be resold within nine months of investing. This blue sky representation was patently untrue. Such representation was premised on the representation the homes were purchased at 90% below fair market value. The homes purchased were generally in a dilapidated condition and could not be sold for much if anything above what was paid. Two years later, the homes remain largely illiquid.

f.   In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented the Fannie Mae REOs would be thoroughly inspected to ensure any homes purchased were in acceptable condition. This representation was patently untrue. In effect, a handful of REIC employees purportedly inspected hundreds of homes over a four day period in at least three different states. At best, the ability to inspect this volume of homes would have been limited to a brisk walk through.

g. In the limited information circulated by REIC and given to the Plaintiffs at or about the time of their investment on April 24, 2008, it was represented that REIC and its affiliates that, as of 2008, REIC had averaged a 67% annual profit return over the past five years. This is a patent misrepresentation. REIC was registered as a limited liability company on October 26, 2007 in the State of Utah.

h. In a meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn presented to the Plaintiffs the Fannie Mae REOs to be an investment in home foreclosure pools purchased at up to 90% below then current fair market values. This representation was patently false. The homes actually purchased were in dilapidated conditions and in depressed economic regions. In reality the 90% discount valuation represented by Krohn was based on estimates from at least two years earlier in dramatically different real estate market conditions. To this day REIC and the Defendants continue to represent to prospective investors they regularly purchase real estate at 90% discounts from current fair market value.

i. In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the Plaintiffs that

Complaint

the investors in the Fannie Mae REOs would at a minimum double their money in less than a year's time. This blue sky representation was and is patently untrue. The Plaintiffs' investment in the home foreclosure pool has gone from one letdown to another. The Defendants have made one excuse after, have held the Plaintiffs' investment funds hostage for more than two years, and have recently refused to return their money with the threat of litigation against the Plaintiffs if they exercise their rights under securities laws to recover the investment.

j.  In same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the Plaintiffs that investors in the Fannie Mae REOs would own the homes. This representation was patently untrue. The plaintiffs have never held title to the homes purportedly purchased.

k.  In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the Plaintiffs the prospective Fannie Mae REOs would receive a thorough inspection. This representation was patently untrue. Shortly before investing, REIC sent a handful of its employees to inspect hundreds of homes all within a four day window. This window would have included travel from Utah to Ohio,

Complaint

Michigan and other Midwest states. In other words, it is a practical impossibility for the Defendants to have inspected all of the prospective Fannie Mae REOs under consideration. In reality, the Defendants purchased the homes largely sight unseen hoping that the percentage of homes in good condition would outweigh any homes in unsellable condition. This investment vetting strategy based on hope was not disclosed to the investors.

l.   In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the Plaintiffs the Fannie Mae REOs would be resold within nine months of investing. This blue sky representation was patently untrue. Such representation was premised on the representation the homes were purchased at 90% below then fair market value. The homes purchased were generally in a dilapidated condition and could not be sold for above what was paid. Two years later, the homes still cannot be sold for much if anything more than originally paid.

m.  In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented the Fannie Mae REOs would be thoroughly inspected to ensure any homes purchased were

Complaint

in acceptable condition. This representation was patently untrue. In effect, a handful of REIC employees purportedly inspected hundreds of homes over a four day period in at least three different states. At best, the ability to inspect this volume of homes would have been limited to a brisk walk through.

n.   In stock certificates delivered to each of the Plaintiffs on or about April 26, 2008, Krohn, REIC and other defendants represent that the Plaintiffs had received "stock" in JDK Investment Group, LLC. This is a patent fraud and legal impossibility. JDK is a limited liability company organized in the State of Utah. As a matter of basic corporate reality, JDK is incapable of issuing "stock" to any investor.

o.   In meetings held on March 26, 2009 and March 27, 2009 attended by the Plaintiffs and Krohn, Krohn represented to the Plaintiffs they had made a 28% profit on their investment in the home foreclosure pools. These representations were patently untrue. The Plaintiffs' 2008 JDK Investment Group K1 statements show an overall net loss in their investment. The Plaintiffs' 2009 The Companies K1 statements show a 12% loss.

p.   In meetings held on March 26, 2009 and March 27, 2009 attended by the Plaintiffs and Krohn, Krohn represented to the Plaintiffs they could reinvest in a new transaction which had a five to eight year time frame, would start paying out passive income within two years, and could pay off the Plaintiffs' original Fannie Mae REOs investment, the Plaintiffs would own the homes free and clear at the conclusion of the investment and the

Plaintiffs would receive "stock" in The Companies, LLC in exchange for their reinvestment. These representations were patently untrue. The Plaintiffs have never received passive income distributions as promised. Any representation as to when any local and national real estate market returns to performing levels is speculative at best. The Plaintiffs have never received any title ownership to the REO homes. The Plaintiff's 2009 The Companies K1 statements state a 12% loss. And as practical corporate matter, a Utah limited liability company is incapable of issuing "stock" to investors.

q.  On or about May 6, 2010, the Plaintiffs received "Certificate[s] of Appreciation" from Krohn and other defendants stating the Plaintiffs had purchased stock in the "Real Estate Investment Companies." The Plaintiffs are unaware of the existence of a company known as the "Real Estate Investment Companies."

r.  On an ongoing basis, the Defendants represented to the Plaintiffs and to the public at large at pitch seminars, at www.reicglobal.com, and at REIC's YouTube Channel that Krohn has a net positive cash flow of more than $20,000 per month from his own personal real estate investments. This is a misrepresentation. The Plaintiffs have recently become aware of at least two occasions in 2009 when REIC used company funds to subsidize Krohn's personal real estate investments. Such subsidies come at the expense of the investor's investment principal and equity, pierces the corporate veil, and is a misuse of corporate and investor funds.

Complaint

s.   On an ongoing basis, the Defendants represent to the Plaintiffs and the public at large that Krohn individually owns over 400 homes and counting. This representation is believed to be wildly inflated and untrue. Such a figure would place Krohn's personal net worth between $4,000,000 by very conservative estimates and more than $60,000,000. It is further believed the 400 home figure includes homes purchased using other investors' funds.

t.   It was represented to the Plaintiffs by Krohn REIC, its affiliates and representatives between 2008 and 2009 through individual meetings described above that they were part of a select and small group of investors allowed to invest with him in Ohio, Michigan and a few other states. This was a misrepresentation. The Investors are now aware of hundreds of investors solicited through offerings by REIC and other defendants through The Companies, Beta Real Estate Holdings and Gamma Real Estate Holdings. Such offerings are evidenced by the Reg D 506 applications submitted to the SEC and Utah Division of Securities.  It is believed the investor funds generated is in the millions of dollars resulting in a drastic dilution of the Plaintiffs' investment stake in REIC, The Companies and other defendants.

u.   REIC's website, www.reicglobal.com, contains numerous client success testimonials. These testimonials invariable convey a message guaranteeing REIC's investment system as infallible. Many such testimonials are misrepresentations. Such testimonials are "harvested" from a prospect

early on in their relationship with REIC or its affiliates when the prospect receives their first lump sum check on a "rent-to-own" property or similar event. However, the public is not informed of the long-term financial sagas of delinquent renters, tenant damaged properties, negative cash flows, inability to resell properties, resulting loan defaults, damaged credit and personal financial destruction.

Such misrepresentations and misstatements by the Defendants were made knowingly or with reason to know of the falsity and further made with the intent to deceive the Plaintiffs thereby inducing them to enter into unregistered investment transactions.

110.    The Defendants' material omissions in violation of the Securities Act and Exchange Act are, but not limited to, as follows:

a.  At the time of investment, no disclosures of material fact were made to the Plaintiffs concerning JDK Investment Group, LLC, The Companies, LLC, REIC, the affiliate companies owned and controlled by REIC, or the underlying investments.

b.  The Plaintiffs and the public at large are not told that prominent REIC client/investor testimonials are from family members, friends and employees of REIC and its affiliates.

c.  REIC and its affiliates continue to use customer testimonials knowing that such individuals have failed in their personal finances and real estate investments with the Defendants without disclosing such failures to existing and prospective investors.

d.  The Plaintiffs were not told that the Fannie Mae REOs originally purchased are in economically depressed regional and local real estate markets and in many cases within neighborhoods consisting of boarded-up properties.

e.  The Plaintiffs were not told the individual defendants' detailed biographical history, including past management and executive experience, personal bankruptcies, past or pending income tax issues, or threatened or pending litigation.

f.  The Defendants' assets and liabilities were not disclosed to the Plaintiffs at the time of investment and since.

g.  Risk analysis associated with an investment REIC, JDK, The Companies, other defendants and real estate was not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

h.  Investment portfolio analysis of REIC, JDK, The Companies, and other defendants was not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

i.  Local, regional, national and global market investment analysis was not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

j.  Debt/leveraging status and analysis were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

k.  Detailed investment strategy employed by REIC, JDK, The Companies, and other defendants was not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

l.  Detailed investment sourcing, screening, vetting and due diligence processes used by REIC, JDK, The Companies, and other defendants were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

m.  REIC, JDK, The Companies, and other defendant investment performance benchmarks were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

n.  Specific investor commitment timeframe was not disclosed to the Plaintiffs by the Defendants at the time of their investment and since.

o.  Risks associated with investment illiquidity were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

p.  Geographic asset specific timeframe analysis was not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

q.  Defined investor distribution benchmarks were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

r.  The historical investment performance of REIC, JDK, The Companies, and other defendants was not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

s.   REIC, JDK, The Companies, and other defendant articles of organization or incorporation were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

t.   REIC, JDK, The Companies, and other defendant bylaws or operating agreement were not disclosed to the Plaintiffs by the Defendants at the time of investment and since.

u.   Investment agreements were not provided or disclosed to the Plaintiffs by the Defendants at the time of investment and since.

v.   Accredited investor qualification and certification were omitted or withheld from the Plaintiffs by the Defendants at the time of investment and since.

w.   Regular account/investment statements were and are withheld from the Plaintiffs by the Defendants at the time of investment and since.

x.   Condition of asset title status and information has been withheld from the Plaintiffs by the Defendants at the time of investment and since.

y.   Identity, scope and status of other investor involvement in REIC, JDK, The Companies, and other defendants has been withheld from the Plaintiffs by the Defendants at the time of investment and since.

z.   The total number of shares issued to all investors or percentage of ownership offered to all investors by REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

aa. The possibility of future dilution of ownership in REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

bb. An investor's right or lack thereof to offset future ownership dilution in REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

cc. Detailed historical financial performance, profits and losses, of REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

dd. That the Plaintiffs would not be on title to property purchased with their investment funds was withheld from Plaintiffs by the Defendants at the time of investment and since.

ee. The Plaintiffs' role or lack thereof in management decision-making was withheld from the Plaintiffs by the Defendants at the time of investment and since.

ff. The Plaintiffs' role or lack thereof in the overall investment management and process was withheld from the Plaintiffs by the Defendants at the time of investment and since.

gg. Detailed investment description in REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

hh. REIC's, JDK's, The Companies', and other defendants' investment monitoring process were withheld from the Plaintiffs by the Defendants at the time of investment and since.

ii. Detailed risk disclosures associated with investment in REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

jj. Detailed risk disclosures associated with investing in real estate based assets was withheld from the Plaintiffs by the Defendants at the time of investment and since.

kk. REIC's, JDK's, The Companies', and other defendants' debt to equity ratios were withheld from the Plaintiffs by the Defendants at the time of investment and since.

ll. The individual investments' debt to equity ratios were withheld from the Plaintiffs by the Defendants at the time of investment and since by the Defendants at the time of investment and since.

mm.    The corporate governance structure of REIC, JDK, The Companies, and other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

nn. The investment management fees of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

oo. All other executive and management compensation of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

pp. Detailed executive and management biographies, including past executive or management experience, background and role in investment process of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

qq. The corporate biography, including philosophy, purpose, history, strategy and competitive advantages of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

rr. The past, current and projected corporate operating costs of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

ss. The corporate assets and liabilities of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

tt. The past capital raising activities of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

uu. The current capital raising requirements and campaigns of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

vv. The planned, anticipated or possible future capital raising requirements or campaigns of REIC, JDK, The Companies, and other defendants were withheld from the Plaintiffs by the Defendants at the time of investment and since.

ww.     The existence or status of threatened or pending litigation against REIC, JDK, The Companies, or other defendants was withheld from the Plaintiffs by the Defendants at the time of investment and since.

xx. Requests for investment status updates and account status updates from REIC, JDK, The Companies, and other defendants by the Plaintiffs have been repeatedly denied by the Defendants at the time of investment and since.

yy. The numerous companies incorporated or affiliated with REIC, JDK, The Companies, and other defendants and their owners have been withheld from the Plaintiffs along with others by the Defendants at the time of investment and since.

zz. Negative Better Business Bureau ratings reflecting consumer complaints against companies owned or affiliated with Krohn, Earl, REIC, JDK, The Companies, and other defendants have been withheld from the Plaintiffs along with others by the Defendants at the time of investment and since.

**(Failure to Register)**

111.    The Securities Act and Exchange Act require an issuer or promoter of a security to file a registration statement prior to the promotion, offer and sale of a security to the public.

112.     The Defendants identified have promoted, offered and sold securities to the Plaintiffs.

113.     The Defendants identified have not filed any registration statements concerning the securities promoted, offered and sold to the Plaintiffs.

114.     The Defendants' failure to file any registration statement constitutes a violation of the Securities Act and Exchange Act.

**(Promoters)**

115.     The Defendants indentified are considered "promoters" under the Securities Act and Exchange Act which define a "promoter" as an individual who acting alone or in concert with another person, takes initiative in founding or organizing the business or enterprise of another person.

116.     Each Defendant identified has either acting alone or in concert with another person, taken initiative in founding or organizing the business or enterprise of each of the Plaintiffs.

117.     Under the Securities Act and Exchange Act a promoter is jointly and severally liable to a plaintiff for the unlawful act of another promoter which violates securities regulations.

118.     By reason of the foregoing, the Defendants directly violated provisions of federal securities statutes as outlined above concerning the unlawful sale of unregistered securities using interstate commerce and have harmed the Plaintiffs in the amount of their principal investment as follows:

    a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.   Kamberly Webb in the principal amount of $50,000.00; and

Complaint

      d.   Louise Webb in the principal amount of $20,000.00.

119.      By reason of the foregoing, the Defendants have directly violated provisions of federal securities statutes as outlined above concerning the unlawful sale of unregistered securities using interstate commerce and have additionally harmed the Plaintiffs by causing them to incur costs and attorney fees associated with this proceeding and loss of interest.

COUNT II
STATE SECURITIES VIOLATIONS

120.      The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 119 as set forth herein.

121.      The Defendants have engaged in the unlawful offer, sale and promotion of unregistered securities in violation of the Utah Uniform Securities Act ("UUSA")

122.      The Defendants have engaged in the unlawful offering, sale and promotion of unregistered securities using fraudulent misrepresentations, misstatements of material facts, and omissions of material facts using means of interstate commerce in violation of the Utah Uniform Securities Act ("UUSA") and rules promulgated by the Utah Division of Securities ("UDS").

**(Security)**

123.      Under the UUSA and rules promulgated by the UDS, a "security" among other things means an investment transaction where a profit expectation to come from the managerial efforts of a third party exists. Further under the UUSA, an interest in a limited liability company also constitutes a security. The investments promoted, offered and sold to the Plaintiffs by the Defendants gave rise to a profit expectation to come from the Defendants' managerial efforts and an interest in a limited liability company constituting a "security" as this term is defined and applied under the UUSA and rules promulgated by the UDS.

Complaint

124.     The Defendants promoted, offered and sold to the Plaintiffs investment interests in Fannie Mae REO pools to be managed by the Defendants and further promoted, offered and sold stock, ownership interests, in JDK Investment Group, LLC, The Companies, LLC and REIC, LLC constituting a "security" pursuant to U.C.A. 1953 § 61-1-1, *et seq.*

**(Fraudulent Statements; Misstatements of Material Fact; Omissions of Material Fact)**

125.     Under the UUSA, it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to (1) employ any device, scheme or artifice to defraud; (2) make any untrue statement of material fact or omit a statement of material fact necessary to make the statement not misleading; or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. *E.g., id.*

126.     Further under the UUSA, it is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, to employ any device, scheme, or artifice to defraud the other person or engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person. *E.g., id.*

127.     The Defendants have violated the UUSA by employing fraudulent and deceptive devices, offered fraudulent misrepresentations, offered material misstatements of fact and omitted material fact, making untrue statements concerning value in association with the promotion, offer and sale of securities within Utah.

128.     The Defendants have further violated the UUSA by omitting to disclose material facts in association with the promotion, offer and sale of securities within Utah. The Plaintiffs incorporate by reference the Defendants' representations and omissions in paragraphs 109 and

110 herein as evidence of the Defendants' fraudulent and deceptive devices, fraudulent misrepresentations, material misstatements and material omissions in violation of the UUSA. Such misrepresentations and misstatements by the Defendants were made knowingly or with reason to know of such falsity and further made with the intent to deceive the Plaintiffs thereby inducing them to enter into unregistered investment transactions.

129.     By accepting consideration for the investment(s) resulting from their abundant false representations, omissions of material fact and scheme to defraud the Investors as discussed previously herein, the Defendants/Promoters further violated the UUSA.

**(Failure to Register)**

130.     The UUSA requires an issuer of a security promoted, offered or sold in Utah to file a registration statement prior to the promotion, offer and sale of a security to the public. *E.g., id.*

131.     Under the UUSA, a party claiming an exemption has the burden of proving the claimed exemption applies.

132.     The Defendants identified have promoted, offered and sold securities to the Plaintiffs in Utah.

133.     The Defendants identified have failed to file any registration statements concerning the securities promoted, offered and sold to the Plaintiffs.

134.     The Defendants' failure to file any registration statements constitutes a violation of the UUSA.

**(Promoters)**

Complaint

135.     The Defendants indentified are considered "promoters" under the UUSA which define a "promoter" as an individual who acting alone or in concert with another person, takes initiative in founding or organizing the business or enterprise of another person.

136.     Each Defendant identified has either acting alone or in concert with another person, taken initiative in founding or organizing the business or enterprise of each of the Plaintiffs.

137.     Under the UUSA a promoter is jointly and severally liable to a plaintiff for the unlawful act of another promoter which violates securities regulations.

138.     By reason of the foregoing, the Defendants directly violated provisions of the UUSA concerning the unlawful sale of unregistered securities in Utah and have harmed the Plaintiffs in the amount of their principal investment as follows:

     a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

     b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

     c.   Kamberly Webb in the principal amount of $50,000.00; and

     d.   Louise Webb in the principal amount of $20,000.00.

139.     By reason of the foregoing, the Defendants/Promoters directly violated provisions of the UUSA concerning the unlawful sale of unregistered securities in Utah and have additionally harmed the Plaintiffs/Investors by causing them to incur costs and attorney fees associated with this proceeding and the loss of interest.

<u>COUNT III</u>
<u>JOINT VENTURE</u>

140.     The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 139 as set forth herein.

Complaint

141.     The Defendants formed and engaged in a joint venture enterprise relating to the offer, sale, and promotion of investments offered to the Investors by the Defendants and are therefore jointly and severally liable for the unlawful acts of each joint venture member

142.     A joint venture is formed when an express or implied agreement exists among the members of a group; a common purpose is to be carried out by the group; a community of pecuniary interests exists among the members in that interest; and an equal right to voice direction in the enterprise exists which gives an equal right of control among the members.

143.     An express or implied agreement existed among the Defendants concerning the offering, selling and promoting investments and securities offered by the Defendants to the Investors.

144.     A common purpose of offering, selling and promoting securities and investments was to be carried out by the Defendants.

145.     A community of pecuniary interests exists among the Defendants concerning the offering, selling and promoting investments and securities offered by the Defendants to the Investors.

146.     An equal right to voice direction in the enterprise exists which gave an equal right of control among the Defendants concerning the offering, selling and promoting investments and securities offered by the Defendants to the Investors.

147.     By reason of the foregoing, the Defendants formed a joint venture concerning the offering, selling and promoting investments and securities offered by the Defendants to the Investors. As such, each of the Defendants as members of a joint venture are jointly and severally liable for the unlawful acts of any other joint venture member.

Complaint

148.    By reason of the foregoing, the Defendants' actions as a joint venture concerning the offering, selling and promoting investments and securities offered by the Defendants to the Plaintiffs have harmed the Plaintiffs in the amount of their principal investment to the Defendants joint venture enterprise as follows:

      a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.   Kamberly Webb in the principal amount of $50,000.00; and

      d.   Louise Webb in the principal amount of $20,000.00.

149.    By reason of the foregoing, the Defendants' actions as a joint venture concerning the offering, selling and promoting investments and securities offered by the Defendants to the Investors have additionally harmed the Plaintiffs by causing them to incur costs and attorney fees associated with this proceeding and the loss of interest.

<u>COUNT IV</u>
<u>CIVIL CONSPIRACY</u>

150.    The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 150 as set forth herein.

151.    The Defendants (1) consisting of two or more individuals or entities; (2) with the objective of inducing the Plaintiffs and other investors to enter into various investment transactions; (3) with a meeting of the minds on the intended investment transactions; (4) in which occurred one or more unlawful overt acts, including but not  limited to, violations of the Securities Act, Exchange Act, the UUSA, fraud, negligence, and conversion; and (5) which actions are the proximate cause of damages to the Plaintiffs through losses of their investment monies.

152.     As a result of the foregoing, the Defendants have formed and engaged in a civil conspiracy.

153.     By reason of the foregoing, the Defendants' civil conspiracy has harmed the Plaintiffs in the amount of their principal investment as follows:

      a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.  Kamberly Webb in the principal amount of $50,000.00; and

      d.  Louise Webb in the principal amount of $20,000.00.

154.     By reason of the foregoing, the Defendants' civil conspiracy has harmed the Plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

COUNT V
FRAUDULENT INDUCEMENT

155.     The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 154 as set forth herein.

156.     The defendants, Krohn and Earl, individually and acting in their capacities as managers and owners of REIC, fraudulently induced the Plaintiffs concerning the offer, sale and promotion of investments and securities offered by the Defendants.

157.     Krohn and Earl made numerous fraudulent misrepresentations and omissions of material fact with the intent to induce the Plaintiffs to invest and purchase investments and securities offered by the Defendants.

Complaint

Page 61 of 66

158.     The Plaintiffs incorporate by reference the Defendants' representations and omissions as contained in paragraphs 109 and 110 herein as evidence of the Defendants' misrepresentations, misstatements and material omissions.

159.     Such misrepresentation, misstatements and omissions by the Defendants were made knowingly or with reason to know of the falsity and further made with the intent to deceive the Plaintiffs thereby inducing them to enter into unregistered investment transactions.

160.     The Plaintiffs relied on the Defendants' numerous fraudulent misrepresentations and omissions of material fact as a basis for making their investment in the securities offered by the Defendants to the Investors. The other defendants, by virtue of respondeat superior, with knowledge or sanctioning Krohn and Earl's fraudulent inducement are vicariously liable.

161.     By reason of the foregoing, the Defendants' fraudulent misrepresentations, misstatements and omissions of material facts have harmed and defrauded the Plaintiffs in the amount of their principal investment as follows:

    a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.   Kamberly Webb in the principal amount of $50,000.00; and

    d.   Louise Webb in the principal amount of $20,000.00.

162.     By reason of the foregoing, the Defendants' fraudulent misrepresentations, misstatements and omissions of material facts have harmed and defrauded the Plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interest.

<u>COUNT VI</u>
<u>CONVERSION</u>

Complaint

163.     The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 162 as set forth herein.

164.     The Defendants have deprived the Plaintiffs' from their money in a manner constituting a permanent deprivation of property without an exchange of adequate consideration.

165.     Throughout April 2008, the Plaintiffs individually delivered funds to the Defendants as follows:

     a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

     b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

     c.  Kamberly Webb in the principal amount of $50,000.00; and

     d.  Louise Webb in the principal amount of $20,000.00.

166.     The Defendants have failed, refused and neglected to return the Plaintiffs' monies as agreed or requested.

167.     The Defendants' failure, refusal and neglect to return the Plaintiffs' monies constitutes conversion.

168.     By reason of the foregoing, the Defendants' conversion has harmed the Plaintiffs in the amount of their principal investment as follows:

     a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

     b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

     c.  Kamberly Webb in the principal amount of $50,000.00; and

     d.  Louise Webb in the principal amount of $20,000.00.

169.     By reason of the foregoing, the Defendants' conversion has harmed the Plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

## COUNT VII
## ALTER EGO/PIERCE CORPORATE VEIL

170.     The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 169 as set forth herein.

171.     Krohn, Earl and REIC are the owners and controlling shareholders of the other corporate defendants. The unity of interest and ownership of Krohn, Earl and REIC is such that there is no separation between the Defendants' personal and the corporate entities. As a result, the observance of the corporate form of the businesses being other than Krohn, Earl, and REIC's alter egos would sanction fraud, promote injustice and cause an inequitable result.

172.     As such, each of the Defendants are jointly and severally liable to the Plaintiffs for the unlawful conduct of each co-defendant, their respective owners, shareholders, managers and agents as outlined herein.

## COUNT VIII
## NEGLIGENCE & RECKLESSNESS

173.     The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 172 as set forth herein.

174.     The Defendants owed the Plaintiffs a duty of care concerning the prudent management of their investments.

175.     The Defendants failed to exercise the requisite duty of care owed to the Plaintiffs.

176.     The Defendants failure to exercise care proximately and actually caused the Plaintiffs damages.

177.     As a result of the foregoing, the Defendants have committed negligence.

178.     By reason of the foregoing, the Defendants' negligence has harmed the Plaintiffs in the amount of their principal investment as follows:

Complaint

    a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.   Kamberly Webb in the principal amount of $50,000.00; and

    d.   Louise Webb in the principal amount of $20,000.00.

179.    By reason of the foregoing, the Defendants' negligence has harmed the Plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

COUNT IX
BREACH OF FIDUCIARY DUTY

180.    The Plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 179 as set forth herein.

181.    The Defendants acted in a fiduciary capacity over the Plaintiffs' property, assets and investment interests.

182.    The Defendants have acted recklessly, negligently and failed to exercise the requisite duty of care owed to the Plaintiffs.

183.    The Defendants' recklessness, negligence and failure to exercise care proximately and actually caused the Plaintiffs damages.

184.    As a result of the foregoing, the Defendants have breach their fiduciary duty.

185.    By reason of the foregoing, the Defendants' breach of fiduciary duty has harmed the Plaintiffs in the amount of their principal investment as follows:

    a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.   Kamberly Webb in the principal amount of $50,000.00; and

Complaint

d.  Louise Webb in the principal amount of $20,000.00.

186.      By reason of the foregoing, the Defendants' breach of fiduciary duty has harmed the Plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiffs are entitled to and pray for relief in the principal amount of no less than $295,000, pre and post judgment interest, punitive damages due to the Defendants' willful, unremorseful and aggravating conduct, reasonable attorney fees and costs of this action.

DATED AND SIGNED this <u>23rd</u> day of December, 2010.

JOHNSTUN LAW, LLC

/s/Aaron K. Johnstun
Aaron K. Johnstun
Attorney for Plaintiffs