Aaron K. Johnstun (USB #13070)
JOHNSTUN LAW, LLC
1411 West 1250 South, Third Floor
Orem, Utah 84058
Office: (801) 893-1795
Fax: (801) 471-2793
Email: aaron@johnstunlaw.com
*Attorney for Plaintiffs/*
  *Defrauded Investors*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TERRY WEBB, et al., | **AMENDED COMPLAINT** |
| **Plaintiffs,** | **(JURY DEMAND)** |
| vs. | |
| KRISTOFFER A. KROHN; et al., | Case No.  2:10-cv-01269 |
| **Defendants.** | Judge Clark Waddoups |

## INTRODUCTION

This action begins with promises of investment returns "too good to be true" using misrepresentations and misstatements and omissions of material facts. It ends as other fraudulent investment schemes with the investment promoters failing to deliver as promised with one excuse after another as to why the investors' money cannot be returned. The defendants' fraudulent investment scheme here is accomplished through a network of individuals and corporate entities with the objective being to promote, offer and sell securities to the public while skirting securities regulation and compliance. Not only have the defendants refused to return the plaintiffs' investment funds, they have threatened the plaintiffs with retaliatory litigation for bringing to light the defendants' unlawful conduct, including federal and state securities violations. The defendants' unlawful securities violations perpetrated upon unsuspecting victims

are ongoing and undeterred. After providing the defendants with numerous opportunities to resolve this matter outside litigation, the plaintiffs are left with no other alternative than to file this action.

## JURISDICTION, VENUE & PARTIES

1.   This Court has subject matter and personal jurisdiction over each of the parties herein pursuant to 28 U.S.C. §§ 1331 & 1367.

2.   Venue is proper pursuant to 28 U.S.C. § 1391.

3.   The plaintiffs are each domiciled and residents of the State of Utah.

4.   The defendant Kristoffer A. Krohn ("Krohn") is a resident of Utah County, Utah and may be served with process by any lawful personal service including personal service at his residence located at 1491 East 1110 North, Orem, Utah 84097.

5.   The defendant Stephen R. Earl ("Earl") is a resident of Utah County, Utah and may be served with process by any lawful personal service including personal service at his residence located at 216 East Ridge Road, Orem, Utah 84057.

6.   The defendant Real Estate Investors Club, LLC a/k/a REIC ("REIC") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Kristoffer Krohn at 1070 East 800 North, Orem, Utah 84057.

7.   The defendant Real Estate Investors Club of Salt Lake County, LLC d/b/a REIC ("REIC Salt Lake") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

8.  The defendant Real Estate Investors Club of Utah County, LLC d/b/a REIC ("REIC Utah") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

9.  The defendant The Companies, LLC ("The Companies") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

10. The defendant JDK Investment Group, LLC ("JDK") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Brad Jacobsen at 3165 E. Millrock Dr. Suite 160, Salt Lake City, Utah 84121.

11. The defendant REO National, LLC ("REO Nat'l") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Kristoffer A Krohn at 1080 East 800 North, Orem, Utah 84097.

12. The defendant The Real Estate Firm, LLC ("TREF") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1080 East 800 North, Orem, Utah 84057 or its registered agent Kristoffer Krohn at the same address.

13. The defendant The Real Estate Firm of Salt Lake County, LLC ("TREFS") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

14. The defendant The Real Estate Firm of Utah County, LLC ("TREFU") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

15. The defendant Strategic Lending, LLC ("Strategic") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1080 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at 1070 East 800 North, Orem, Utah 84057.

16. The defendant Strategic Lending of Utah County, LLC ("Strategic UC") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1080 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

17. The defendant The Property Management Company, LLC ("TPMC") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Stephen Earl at the same address.

18. The defendant The Financial Firm, LLC ("TFF") is a Utah limited liability company and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent Brad Jacobsen at 3165 E. Millrock Dr. Suite 160, Salt Lake City, Utah 84121.

19. The defendant Beta Real Estate Holdings, L.P. ("BREH") is a Delaware limited partnership and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent The

Corporation Company at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

20. The defendant Gamma Real Estate Holdings, L.P. ("GREH") is a Delaware limited partnership and may be served with process by serving an officer or manager at its principal place of business at 1070 East 800 North, Orem, Utah 84057 or its registered agent The Corporation Company at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

21. The defendants John Does 1-10 are unidentified executives, officers and managers of the above business defendants having knowledge and participated in the unlawful conduct described herein. Such individuals may as information becomes available be named as defendants through an amended complaint.

## THE GENERAL SCHEME

22. Based out of Orem, Utah, the defendants operate an opportunistic investment scheme which violates federal and state securities laws ("Investment Scheme"). The various investments promoted, offered and sold by defendants to the plaintiffs include a short-term fractional purchase of gold bullion reserves purportedly protected by the U.S. military, purchase of Fannie Mae home foreclosure pools and minority non-voting interests or "stock" ownership in business entities formed and controlled by the defendants. To entice investors, the defendants represent having exclusive ability to purchase foreclosed residential properties around the country at up to 90% discounts and guarantee 100% investment returns in less than a year's time using fail proof investment strategies.

23. In reality, investors like the plaintiffs invest in nothing more than highly speculative unregistered securities lured by the defendants' reckless blue sky promises, misrepresentations,

material misstates and omissions of material facts. In return for their investment (collectively totaling in multiple millions) investors like the plaintiffs receive little more than a stock certificate printed from a desktop printer.

24. The defendants intentionally network through investors' families and friends to promote, offer and sell their investments to the plaintiffs and the public constituting what is known as "affinity fraud."

25. Upon approaching the defendants for return of their investment, the defendants have attempted to lull the plaintiffs with additional misrepresentations, misstatements and omissions of material facts in an attempt to keep the plaintiffs invested and from receiving their investment funds back.

26. The defendants' Investment Scheme based out of Orem, Utah is done under the general corporate brand name of REIC. The individual promoters of the Investment Scheme include the defendants Krohn and Earl who are the officers and owners of the business entity defendants.

27.  Connected with REIC are numerous affiliate companies organized and commonly owned by Krohn and Earl and operating under the REIC brand and umbrella of companies. The ultimate purpose for each affiliate company is soliciting and managing the investments promoted, offered and sold to the public by Krohn, Earl and REIC. These companies include REIC, REIC Salt Lake, REIC Utah, The Companies, JDK, REO Nat'l, TREF, TREFS, TREFU, Strategic, Strategic UC, TPMC, TFF, BREH, and GREH. The investor funds are commingled among and fund the foregoing entity defendants.

28. In addition to the named defendants, there are a number of individuals acting as executives, officers or managers for REIC with knowledge and participation in the investment solicitations to the plaintiffs and the public. These individuals are believed to have full

knowledge and participation in the promotion, offer, and sale of unregistered securities to investors alongside Krohn and Earl and defendant entities. These individuals are identified as John Does 1-10.

29. Contrary to the representation of the individual defendants, the plaintiffs' investment funds have intentionally been used to fund the general capital and operational expenses of the Krohn and Earl's business entities, or entity defendants. The viability of the entity defendants rely upon and require the capital funding from investors like the plaintiffs.

## THE OFFERINGS & INVESTMENT

30. Travis and Kristy Webb first became involved with the defendants in January 2008 by signing up for REIC's "Ultimate Investment Experience." This included a "Lease Option Live Class," REIC's investment educational workshop and mentoring programs. The cost for these investment education services cost Travis and Kristy Webb $2,999.00. Shortly thereafter, Travis and Kristy purchased two residential properties using the purported fail proof strategies taught by REIC. In the course of being "mentored" by Krohn, Travis and Kristy divulged sensitive financial information to REIC. These investments have not gone well and ultimately have caused them serious financial difficulties.

(The 2008 REO Offering & Investment)

31. On or about April 18, 2008, Travis Webb received an unexpected phone call from Krohn. In this phone conversation Krohn offered Travis the opportunity to invest in a pooled investment involving bulk foreclosure homes purchased from Fannie Mae (hereafter "REO Investment"). Krohn told Travis that he was only letting a few people know about the REO Investment and needed to raise around $3 million. The REO Investment was to consist of two pools of foreclosed homes to be purchased from Fannie Mae, one in Ohio and the other Michigan. Krohn

said the investment would be a once in a lifetime investment and that only individuals with enough money could invest.  In a follow-up communication to Travis, Krohn asked Travis to let his family know about the deal and that he needed to raise about $3 million within a week. The promoters, including John Sorenson ("Sorenson") and Dave Kaplar ("Kaplar"), structured the REO Investment as a fractional shareholder interest in a limited liability company registered as "JDK Investments, LLC."

32. The plaintiffs have since learned from corporate records that Krohn only contributed $11k of his own money in the REO Investment while taking a grossly exorbitant 25% overall ownership interest in JDK. Sorenson and Kaplar did not put any money in the REO Investment while each also took a grossly exorbitant 25% overall ownership interest as well. Thus, Krohn, Sorenson and Kaplar contributed a mere $11,000 total in the REO Investment and JDK while taking a grossly exorbitant 75% stake in the investment.

33. In contrast, the actual investors, including the plaintiffs, received a diminutive 25% stake in return for $1.5 million collectively invested. The plaintiffs received a 3.95% stake in return for collectively investment totaling $295,000. Expressed as a ratio, Krohn, Sorenson and Kaplar contributed roughly $1 for every $150 contributed by the investors while taking a 75% equity stake in the investment.

34. In an email dated April 19, 2008, Rodney Beacham, a senior level REIC employee, sent an email to prospective investors on behalf of the defendants, including Travis Webb, discussing what a fantastic deal the REO Investment was. The email represented the homes purchased were discounted 88% (Ohio pool) and 80% (Michigan pool) respectively. Importantly, along with prospective investors, both Krohn and Earl were "cc'd" (at their REIC email accounts) on

Beacham's April 19, 2008 email establishing Earl had actual knowledge from the beginning and actively participated in promoting the REO Investment with Krohn.

35. In Beacham's April 19, 2008 email, the following misrepresentations concerning the REO Investment were made with Krohn and Earl's full knowledge:

      a.  the REO Investment was the "most amazing deal [the investment promoters] have ever been aware of";

      b.  the REOs were being purchased at an 88% and 80% discount off their "conservative" estimated fair market value; and

      c.  the estimated value of the REOs were within 10% of their actual fair market value; and

      d.  the defendants' fair market value estimate of the REOs was more accurate than the lower fair market estimates by the counties in which the REOs were located.

36. The above representations have since been admitted as untrue by the defendants. On April 13, 2009 Krohn sent an email to the plaintiffs and the REO Investment investors expressly admitting that he could not sell the REOs due to existing market conditions—also an admission his original fair market value estimate a year earlier had been grossly exaggerated. Krohn's admission further supports that the REOs were not properly inspected and appraised to begin with contrary to the representations by the defendants.

37. At the suggestion of Krohn, Travis Webb contacted his family members to discuss the investment opportunity as represented to him by Krohn and other individuals through REIC. The Webb family then met with Krohn at REIC on or about April 18, 2008 to discuss the investment. At this meeting with the Webb family Krohn represented that by investing in the REO Investment they would double their money in less than 9 months, that the properties to be

purchased were being purchased at 90% below fair market value, that the investment strategy was failsafe and used by the Rockefeller family to become billionaires during the Great Depression, that their investment would be secured by receiving title to the properties purchased, and that as further collateral they would also receive stock ownership in a company formed by the defendants. In reality, the REOs were/are located in depressed real estate markets and largely in dilapidated condition. The defendants have since admitted in April 2009 the REO Investment did not go well with as much as 20% of the REO foreclosure homes purchased estimated in unsellable condition. The plaintiffs have never received title to the individual REOs purchased. Again, this contradicts Krohn's representation April 23, 2008 email, *infra*, that all of the properties would be thoroughly inspected and accurately appraised.

38. On April 23, 2008, Krohn (using his REIC email account) sent an email to the plaintiffs and other prospective investors in the REO Investment making the following misrepresentations:

   a.  REIC had sent 3 [REIC] staff members to Ohio and Michigan who would be able to thoroughly inspect, take pictures and verify CMA valuations of 202 homes by Tuesday of the following week (or 6 days excluding date of travel from Utah to Ohio and Michigan); and

   b.  that 3 more [REIC] staff members would fly out the next day (April 24, 2008) and 2 more the following (April 25, 2008) to thoroughly inspect, take pictures and verify CMA values on the 202 homes in Ohio and Michigan.

39. Krohn's April 23, 2008 email led the plaintiffs and the other REO Investment investors to believe REIC and its staff members **a)** were legally licensed and qualified to appraise and inspect residential properties in Ohio and Michigan and **b)** that in the span of 6 days, 202 (later in a May 2, 2008 email stated at 300 by Krohn) homes in two different states, or 33.5 homes per day on

average, could be thoroughly inspected and accurately appraised. Krohn's representations in the April 23, 2008 email were obviously false and reckless. Krohn would have either had direct knowledge that the REIC "staff" members sent to Ohio and Michigan were not licensed inspectors or appraisers in Ohio and Michigan or made with a reckless indifference to the truth. The same would apply to the ability to physically inspect and appraise 33.5 homes per day with any degree of thoroughness to make an informed investment decision. REIC and its staff members' lack of licensure in Michigan and Ohio to appraise and inspect real property further likely violates Michigan and Ohio law. *E.g.,* Mich. Comp. Laws Ann. § 339.2607; *see also* Ohio Rev. Code Ann. §§ 4763.13(F), 4763.19, 4763.99.

40. Krohn's April 23, 2008 email and misrepresentations concerning the ability to legally, accurately and thoroughly inspect and appraise the REOs was made in the day(s) immediately before the plaintiffs' and other JDK investors were making their investment decision supporting the inference that Krohn made such misrepresentations in order to close the deal and secure their investment.

41. On or about April 24, 2008, the Webb family using Cashier's Checks collectively invested $295,000 in the defendants' REO Investment scheme and JDK. Never at any time have the plaintiffs been provided with a "private placement memorandum" ("PPM") or information customarily associated with legitimate full disclosures relating to the REO Investment or JDK. The information withheld from the plaintiffs includes, but, not limited to: a) biographical history of REIC, JDK and affiliates; b) executive bios and compensation; c) relevant personal and corporate bankruptcies; d) status of past or pending income tax issues; e) past or threatened litigation; f) risk analysis associated with investment; investment portfolio; g) local, regional, national and global market analysis; h) debt leverage status and analysis of the investments and

REIC, JDK and affiliates; i) detailed investment strategy; j) investment sourcing, screening, vetting and due diligence process; k) historical investment performance; l) historical profitability performance of REIC, JDK and affiliates; m) investment performance benchmarks; n) investment commitment timeframe; o) risks associated with loss, illiquidity, condition of asset, preexisting liens and clouded title, etc.; p) geographic specific investment timeframe; q) articles of organization or incorporation, operating agreement or bylaws; r) investment agreements; s) accredited investor verification and questionnaire; t) investment registration documents; u) analysis of prospective income tax consequences; v) scope, status and identity of other investor involvement; w) possibility of investment dilution through additional investor involvement or debt issuance; x) right or lack thereof to prevent investment dilution; y) ability for assets acquired investor proceeds to be sold or transferred; z) detailed historical financial performance of REIC, JDK and affiliates including profit and loss reports; aa) ownership of title; investor role or lack thereof in investment and corporate management decisions; ab) investment description; ac) risk disclosures related to investing in REIC, JDK and affiliates; ad) risk disclosures related to investing in real estate based assets; ae) investment debt to equity ratio analysis; af) debt to equity ratio of REIC, JDK and its affiliates; ag) corporate governance structure of REIC, JDK and affiliates; ah) detailed executive and management biographies, including past executive and management experience, background and education, and role in investment process; ai) corporate biography of REIC, JDK and affiliates including philosophy, history, strategy and competitive advantages; aj) costs associated with investment in real estate; corporate operating costs associated with REIC, JDK and affiliates; ak) past capital raising activities of REIC and its affiliates; and al) possibility of additional capital raising activities of REIC, JDK and affiliates.

Amended Complaint

42. On May 2, 2008, Krohn sent an email to the plaintiffs and other JDK investors from his REIC email account. In this email Krohn made the following misrepresentations:

    a.  REIC had thoroughly researched and physically inspected over 300 homes in Michigan and Ohio and were in the process of determining the value of the properties purchased.

43. This May 2, 2008 email from Krohn directly contradicts his April 23, 2008 representation that REIC would accurately appraise the value of the REOs. In this May 2, 2008 email Krohn admits that after purchasing the REOs, REIC was after the fact in the process of "determining the value of the homes [purchased]." This was a direct admission that REIC in fact had not appraised the value of the homes contradicting the earlier representations that REIC had accurately appraised the value of the REOs in order to make an informed investment decision.

44. Krohn's May 2, 2008 email was made at a time the investors, including the plaintiffs, were making their investment decision or had recently made their investment decision and supports an inference he made this misrepresentation with the intent to induce an investment or lull the plaintiffs and other JDK investors to remain invested.

45. On May 7, 2008, Krohn using his REIC email account sent another email to the plaintiffs and JDK investors. In this email, Krohn made the following misrepresentation:

    a.  that the owners of JDK (Krohn, Sorenson and Kaplar) had invested $300,000 of their own investment funds in the REO Investment and JDK.

46. Krohn's May 7, 2008 email representing that Krohn, Sorenson and Kaplar had invested $300,000 of their own money is a glaring falsehood which Krohn would have had absolute knowledge of. The corporate records of JDK unequivocally show that Krohn, Sorenson and Kaplar each invested a grand total of $11,000 of their own money in the REO Investment and

JDK. JDK was formed on April 21, 2008, 15 days prior to this email evidencing that Krohn, an original member of JDK, had express knowledge concerning the falsity of this statement.

47. Krohn's May 7, 2008 emailing patently misrepresenting the capital contribution of Krohn, Sorenson and Kaplar was done at a time these three individuals were taking a 75% ownership stake in JDK  for a mere $11,000 while the plaintiffs and other investors split a meager 25% stake pro-rata in return for a combined $1.5 million contribution. It also came at a time the investors, including the plaintiffs, made their investment decision or had recently made their investment decision. This supports the inference that Krohn acted with scienter to deceive the plaintiffs and JDK investors relating to immediate dilution of their investment value. This deception skewing the initial benchmark value also carried over to the plaintiffs' and other investors' perception of their investment value as part of the lulling and conversion to The Companies.

48. Aside from the blue sky guaranteed investment return, absolutely no disclosures were provided to the Webb family or accredited investor verification concerning the REO Investment. The misrepresentations and fraudulent promises are aggravated by the fact the defendants actively asked and encouraged investors to promote the investment to their family members and friends (i.e. "affinity fraud").

(The 2008 Gold Refinery Offering)

49. In a September 22, 2008, Krohn, using his REIC email account promoted and offered a second investment offering to the plaintiffs. This offering involved an unregistered investment in a gold refinery purportedly ready to refine 5000 tons of gold under "lock and key" at a U.S. Army depot. According to Krohn investors were to receive a guaranteed 500% return within 6 months collateralized "19 times over," or $28.5 million. No disclosures were provided in

association with the offering. Although Krohn represented to have conducted "intense due diligence" in about a week's time. Krohn concluded this email stating he was even more confident in this investment than the REO Investment and anyone interested should contact him "ASAP." None of Krohn's "intense due diligence," accredited investor certification or disclosures were provided to the plaintiffs. They decided against investing.

50. Krohn's 2008 Gold Refinery Offering to the plaintiffs illustrates a pattern by Krohn and REIC recklessly making speculative unregistered investment offerings to the public without providing disclosures or taking measures to ensure investors are accredited. It also illustrates Krohn's reckless indifference as to what "intense due diligence" entails, i.e. private placement memorandum or registration statement, for an unaccredited investor or suitability in unregistered securities to make an informed investment decision.

(The 2nd 2008 REO Offering)

51. On October 10, 2008, Krohn using his REIC email promoted and offered a third investment offering to the plaintiffs and other investors. This investment offering was to participate in an additional pool of 250,000 foreclosure homes purchased from Fannie Mae at over 92% discount below fair market value. No disclosures were provided in association with the offering. The plaintiffs again refrained from investing.

52. Krohn's 2nd 2008 REO Offering to the plaintiffs further illustrates and supports a pattern by Krohn and REIC recklessly making speculative unregistered investment offerings to the public without any disclosures or accredited investor verification or suitability.

(2009 "Lulling" or Conversion of JDK to The Companies)

53. Out of increasing frustration over a lack of information and accountability, the plaintiffs approached the defendants and their officers beginning in April 2009 to discuss the status of the

REO Investment. Krohn admitted that the REO Investment had not gone well, but, that they had made a 28% overall profit (this is demonstratively false as the plaintiffs' 2009 K1 statements show an overall 12% loss and later contradicted by Krohn in an April 13, 2009 email). Krohn went on to explain he had learned new strategies from the REO Investment experience that was actually even better if the plaintiffs were interested in remaining invested. Krohn explained the new investment strategy included a long-term hold until the real estate markets recovered in about 5 years. In the meantime, the defendants allegedly would continue purchasing REO homes at over 90% discounts using additional investment capital raised from new investors and then rent the homes purchased until the real estate markets recovered in the future. The plaintiffs were told that within 2 years they would start receiving rental income which by itself would double their original investment and then would end up owning the homes purchased outright. Krohn explained this as "owning the kitchen that made the pies" instead of just "buying the pies." According to Krohn, to remain invested the plaintiffs would need to convert their shares in JDK Investments, LLC to shares in "The Companies, LLC."

54. The Companies was formed by Krohn (through Krohn Investments, LLC) and Earl (through RE Brokers, LLC) on July 25, 2008. Each contributed $10,000 for a 50% stake. The collective amount funded by Krohn and Earl was far below the capital requirements of The Companies.

55. To induce the plaintiffs to remain invested with REIC and the defendants, Krohn provided the plaintiffs with a "Business Plan" bearing the REIC name guaranteeing that $100,000 invested in 2009 would be worth nearly $5 million by 2014. Again, absolutely no disclosures or accredited investor verification were given to the plaintiffs in association with remaining invested by converting their ownership interest in JDK to The Companies. Of

particular note is the omission that the shares the plaintiffs were converting to were non-voting. Also omitted was that the shares were grossly diluted in proportion to their capital investment and that 80% percent of the ownership was reserved by Krohn and Earl for $20,000 total contributed. The 80% percent ownership and full voting ownership reserved by Krohn and Earl came from a mere combined $20,000 capital contribution, again undisclosed, whereas the remaining diminutive 20% non-voting was based on $3 million from investors like the plaintiffs. The plaintiffs' 2010 K1 statements show additional losses and significant dilution from their 2009 ownership interest evidencing additional investors. While the plaintiffs' and investors' ownership percentages continue to be diluted with an additional 108 investors brought on, Krohn and Earl's ownership percentage has only decreased to 77% as of 2010. Expressed as a ratio, Krohn and Earl's combined capital contribution is $1 for every $150 contributed by the investors like the plaintiffs.

56. In an April 13, 2009 email to the plaintiffs, Krohn explained that REIC's CEO (Earl) and CFO (Mike Krohn, Krohn's brother) were working on acquiring new investors to fund a buyout of the old investors and conversion from JDK to The Companies. At the same time Krohn contradicted himself by telling the plaintiffs and the JDK investors that they had realized a 28% return on the original REO Investment. In other words, while telling investors they had realized a 28% return on the REO Investment, or that the investment had been a financial success, Krohn represented there was not enough funds available to pay back all the investors. The solution according to Krohn was to encourage as many existing investors as possible to remain invested by converting their REO Investment to The Companies while also bringing on new investors. One of the ways Krohn did this was by circulating a "Business Plan" bearing the REIC name to

the plaintiffs and other JDK investors in April 2009 which represented $100,000 invested in 2009 would be worth $5 million by 2014.

57. Importantly, Krohn also represented to the plaintiffs in his April 13, 2009 email that The Companies had agreed to purchase his own personal REO investments with cash and stock. Krohn omitted to disclose to the plaintiffs and other JDK investors what was being purchased, the fair market value and the specific terms. Further, Krohn failed to disclose to the plaintiffs and other JDK investors that The Companies was owned by Krohn and Earl and not a neutral third-party company dealing at arm's length. Instead, The Companies was a company formed and owned by Krohn and Earl who collectively assumed an 80% equity stake after raising $3 million in investor funds. In other words, Krohn and Earl used the plaintiffs' and other JDK investors' investment funds to buy Krohn's own personal REOs in which Krohn reserved an 80% ownership equity stake with exclusive voting rights while contributing what amounts to a *de minimus* amount of their own money in.

58. Krohn's direct contradiction that the plaintiffs and JDK investors had realized a 28% return (contradicted by the actual JDK partner 2009 K1 statements expressing a loss) but that their investment couldn't be cashed out gives rise to a strong inference that Krohn acted with scienter to maintain investor confidence in order to self-deal and unload his own personal real estate investments. The inference of scienter from the foregoing facts are further aggravated by Krohn making such patent misrepresentations with the stated intent lull investors to remain invested while reserving an excessive equity stake in The Companies while omitting to disclose to the investors and plaintiffs he and Earl were the founding owners of The Companies and would retain exclusive voting control and contribute a pittance in comparison to the capital contributions by the investors.

Amended Complaint

59. The strong inference here is that Krohn, and Earl intentionally misrepresented and omitted to disclose there was never an ability to pay out because the REO Investment had actually ended in a loss (supported by the investors' 2009 K1 statements) while at the same time Krohn was engaging in undisclosed self-dealing by dumping his own personal investments on The Companies, and Krohn and Earl were taking an undisclosed 80% equity stake in The Companies with an insignificant contribution of their own money down thru the original investment funds of the plaintiffs and other JDK investors.

60. The plaintiffs have further since learned from JDK's 2009 tax return that at some point in 2009 an undisclosed $753,000 cash distribution was made while most if not all of the original investors were lulled into remaining invested by converting to The Companies. This cash distribution, constituting half of the capital contribution of the plaintiffs and other JDK investors further supports an inference Krohn and Earl acted with scienter based on the above misrepresentations and omissions of material facts to take undisclosed distributions while self-dealing.

61. Never at any time have the plaintiffs been provided with a "private placement memorandum" ("PPM") or information customarily associated with legitimate investor disclosures relating to the REO Investment, JDK and The Companies. The information withheld from the plaintiffs includes, but, not limited to: a) biographical history of REIC, JDK, The Companies and affiliates; b) executive bios and compensation; c) relevant personal and corporate bankruptcies; d) status of past or pending income tax issues; e) past or threatened litigation; f) risk analysis associated with investment; g) investment portfolio; h) local, regional, national and global market analysis; i) debt leverage status and analysis of the investments and REIC, JDK, The Companies and affiliates; j) detailed investment strategy; k) investment sourcing, screening,

vetting and due diligence process; l) historical investment performance; m) historical profitability performance of REIC, JDK, The Companies and affiliates; n) investment performance benchmarks; o) investment commitment timeframe; p) risks associated with loss, illiquidity, condition of asset, preexisting liens and clouded title, etc.; q) geographic specific investment timeframe; r) articles of organization or incorporation, operating agreement or bylaws; s) investment agreements; t) accredited investor verification and questionnaire; u) investment registration documents; v) analysis of prospective income tax consequences; w) scope, status, identity, and equity interest of other investor/owner involvement; x) possibility of investment dilution through additional investor involvement or debt issuance; y) right or lack thereof to prevent investment dilution; z) ability for assets acquired investor proceeds to be sold or transferred; aa) detailed historical financial performance of REIC, JDK, The Companies and affiliates including profit and loss reports; ab) ownership of title to assets; ac) investor role or lack thereof in investment and corporate management decisions; ad) investment description; ae) risk disclosures related to investing in REIC, JDK, The Companies and affiliates; af) risk disclosures related to investing in real estate based assets; ag) investment debt to equity ratio analysis; ah) debt to equity ratio of REIC, JDK, The Companies and its affiliates; ai) corporate governance structure of REIC, JDK, The Companies and affiliates; aj) detailed executive and management biographies, including past executive and management experience, background and education, and role in investment process; ak) corporate biography of REIC, JDK, The Companies and affiliates including philosophy, history, strategy and competitive advantages; al) costs associated with investment in real estate; am) corporate operating costs associated with REIC, JDK, The Companies and affiliates; an) past capital raising activities of REIC, JDK, The Companies and affiliates; ao) possibility of future capital raising activities of REIC, JDK, The

Companies and affiliates; and ap) intended use of investment funds by REIC, JDK, The Companies and affiliates.

(Ponzi Scheme)

62. In the same April 13, 2009 email, while representing the investors had realized a 28% profit Krohn admitted the defendants could not flip the entire REO pool and it would be necessary to bring in more investors in order to buyout the first investors. Krohn explained that REIC's CEO (Earl) and CFO (Mike Krohn, Krohn's brother) and legal team were working hard on this strategy. Again, this is further evidence Earl and other officers of REIC had direct knowledge and actively participated in the REO Investment and lulling or reinvestment in The Companies.

63. The new investor funds according to Krohn were to be acquired through new investors in REIC who in turn would purchase REOs owned and managed by the affiliate entity defendants in turn owned and managed by REIC and The Companies. The funds generated, in addition to funding the entity defendants, would then be funneled back through the network of companies, REIC and ultimately The Companies. Some of the new investors as explained by Krohn were to come through investors converting their traditional IRAs to "self-directed" IRAs and then investing such IRA funds in REOs owned and managed by the affiliate companies owned by REIC. The conversion of the new investors IRAs to self-directed would be facilitated through the TFF, also owned by The Companies. The transfer of the REOs is then facilitated and enabled by REO Nat'l, TREF, TREFS, TREFU, BREH, and GREH, REIC, REIC Salt Lake, and REIC Utah with investor funds from the same transaction ultimately filtering through each.

64. What this means is that unbeknownst to the initial JDK investors, including the plaintiffs, is that the REO assets purchased had not migrated with them to The Companies. Instead such

assets had been transferred to the various companies owned and controlled by The Companies which in turn were being resold to bring in new investors to allegedly payoff older investors.

65. Krohn's April 13, 2009 email directly admits paying off earlier investors through the funds of later investors, or a "Ponzi" scheme. Further, and importantly, Krohn's April 13, 2009 email represents that REIC's CEO (Earl) and CFO (Mike Krohn, Krohn's brother) were not only aware, but, actively participated in this repayment scheme.

## THE INDIVIDUAL DEFENDANTS

66. The main individual players are the defendants Krohn, Earl and other executives, officers and managers of REIC and its affiliates identified as John Does 1-10.

67. **Krohn** is represented as REIC's founder and president. By all accounts he is the face of REIC's advertising and investment representations. He is also the purported originator of the "Strait Path" real estate investing system and author of the self-published book, "The Strait Path to Real Estate Wealth." Krohn along with REIC represent the Strait Path strategy as proven to work in any market, especially down markets, lacks risk and is the singular best real estate strategy ever devised. Krohn represents to personally own more than 400 properties placing his net worth between $4 million conservatively to more than $60 million. Krohn describes himself as having owned numerous successful investment companies and presents himself to the public as an investor, mentor and financial liberator. On April 12, 2010, Krohn was named a defendant in the Utah Fourth District Court, Case No. 108200272, for failure to return REIC membership fees to an investor. On May 25, 2010 a bench trial was held with judgment entered against Krohn in the amount of $4,401.65. Krohn was also named as a defendant in the Utah Fourth District Court by the Utah State Tax Commission, Case No. 076406521, for a tax lien. On October 15, 2007, judgment was entered against Krohn in the amount of $946.54. Krohn along with Earl are

co-owners of Life Mastery Systems, LLC, a Utah company. According to the Utah Better Business Bureau, Life Mastery Systems, LLC has an "F" rating, the lowest possible due to a failure to respond to customer complaints.

68. **Earl** is Krohn's business partner and Chief Executive Officer of REIC. Earl is purported to have founded Pro System Painting Company and grew this company into one of the largest residential painting contracting companies in Utah County. Earl oversees the daily operations of REIC, marketing, client management and investment management of REIC. As evidenced by official REIC emails, Earl is at all times with knowledge and control over the promotion, offer and sale of the REO Investment, JDK and The Companies to the plaintiffs and the public. In addition to Krohn and Earl, REIC employs a number of executives, officers and managers that handle and control marketing, client management and investment management and directly involved and participate in the promotion, offer and sale of unregistered securities in violation of federal and state law(s). These individuals are identified as John Does 1-10.

69. The plaintiffs have withheld naming certain individuals like John Sorenson and David Kaplar as defendants until further discovery shows they had direct knowledge and control over the securities violations described herein. However, as discussed below, it is generally suspected these individuals had knowledge of the investment offerings made to the plaintiffs and had some control and ownership of the business entities in which the plaintiffs were purported to receive stock ownership in exchange for their investment. Upon the outcome of such discovery, the plaintiffs wish to reserve the right with the Court's leave to amend this complaint to include these and similar individuals.

### THE BUSINESS DEFENDANTS

70. The corporate players enabling the defendants' scheme include the defendant Real Estate Investors Club, LLC d/b/a REIC along with its affiliate and alter ego corporate entities Real Estate Investors Club of Salt Lake County, LLC d/b/a REIC, Real Estate Investors Club of Utah County, LLC d/b/a REIC, The Companies, LLC and JDK Investment Group, LLC, REO National, LLC, The Real Estate Firm, LLC, The Real Estate Firm of Salt Lake County, LLC, The Real Estate Firm of Utah County, LLC, The Property Management Company, LLC, The Financial Firm, LLC, Beta Real Estate Holdings, L.P., and Gamma Real Estate Holdings, L.P. Each of these entities are either directly or indirectly owned, operated and controlled by Krohn and Earl.

71. The operation of these entities are interrelated through common ownership, funding, co-mingling of funds, corporate headquarters, officers, executives, managers, employees and purpose in furthering the REIC organization and promotion of investments to investors like the plaintiffs. The defendant REIC's 2010 investor annual report titled "The Companies 2010 Year End Report" illustrates the commonality and joint operation of the various business defendants as follows:

> "Beneath the parent company fall our individual affiliated businesses. Our [REIC's] clients have the opportunity to work with all of them during the transaction process and long-term asset building."

Each of the above defendant entities were undercapitalized upon their date of formation requiring investor funds to make the day-to-day operations of each viable.

72. The plaintiffs are informed by past employees of instances in 2009 and thereafter in which funds from the entity defendants were commingled between the defendant entities and in other instances in which corporate funds have been used to pay for the personal expenditures of Krohn and/or Earl.

73. **Real Estate Investors Club, LLC** ("REIC") was registered with the State of Utah on October 26, 2007 by Krohn and with Krohn to act as the sole owner and manager. Krohn and Earl own and manage REIC together. Starting on May 27, 2009, a year after the REO Investment and after conversion to The Companies, Mike Krohn, the Chief Financial Officer for REIC, submitted multiple "Form D" exempt offering notices for The Companies and Beta Real Estate Holdings with the United States Securities and Exchange Commission and the Utah Division of Securities, *infra*. REIC is the corporate face for the defendants under which marketing, management, investor education and investment promotion take place. Specifically, REIC represents to own a full service "Power Team" consisting of Real Estate Investment Companies, The Real Estate Firm, LLC, Strategic Lending, LLC, The Property Management Company, LLC, REO National, LLC and The Financial Firm, LLC. REIC represents its "Power Team" to find and manage every aspect of an REIC investor's investment, including the plaintiffs.

74. **Real Estate Investors Club of Utah County, LLC** ("REIC Utah") was registered with the State of Utah on July 25, 2008 with Krohn and Earl to act as the owners and managers. REIC Utah is a subsidiary and alter ego of its parent company REIC.

75. **Real Estate Investors Club of Salt Lake County, LLC** ("REIC Salt Lake") was registered with the State of Utah on March 12, 2009 with Krohn and Earl to act as the owners and managers. REIC Salt Lake is an alter ego of its parent company REIC.

76. **The Real Estate Firm** ("TREF") was registered with the State of Utah on January 10, 2008 with Krohn and Benjamin Gale to act as the owners and managers. TREF is REIC's in-house real estate brokerage and purports to locate, research, analyze and negotiate the purchase of deeply discounted properties like those purchased in the REO Investment.

77. **The Real Estate Firm of Salt Lake County, LLC** ("REFS") was registered with the State of Utah on May 12, 2009 with Krohn and Earl to act as the owners and managers. REFS is a subsidiary of its parent company REIC and is used to transfer the REOs purchased by the plaintiffs' investment.

78. **The Real Estate Firm of Utah County, LLC** ("REFU") was registered with the State of Utah on July 25, 2008 with Krohn and Earl to act as the owners and managers. REFU is a subsidiary of its parent company REIC and is used to transfer the REOs purchased by the plaintiffs' investment.

79. **Strategic Lending, LLC** ("Strategic") was registered with the State of Utah on March 10, 2004 with Sean Whalen to act as the owner and manager. On or about July 30, 2008 Krohn and Earl were added as the sole owners and managers. Strategic is REIC's in-house lender which purports to use a proprietary finance formula maximizing an investor's ability to finance multiple homes. Specifically, Strategic obtains financing for REIC's investors to leverage and purchase the maximum amount of real estate investments, including investments acquired directly from REIC.

80. **Strategic Lending of Utah County** ("SLUC") was registered with the State of Utah on July 25, 2008 with Krohn and Earl to act as the owners and managers. Strategic is REIC's in-house lender which purports to use a proprietary finance formula maximizing an investor's ability to finance multiple homes. Specifically, Strategic obtains financing for REIC's investors to leverage and purchase the maximum amount of real estate investments, including investments acquired directly from REIC.

81. **The Real Estate Firm** ("TREF") was registered with the State of Utah on January 10, 2008 with Krohn and Benjamin Gale to act as the owners and managers. TREF is REIC's in-

house real estate brokerage and purports to locate, research, analyze and negotiate the purchase of REOs purchased using the plaintiffs' investment. This is done for a management fee.

82. **The Property Management Company** ("TPMC") was registered with the State of Utah on July 29, 2008 with Krohn and Earl to act as the owners and managers. TPMC is purported to execute REIC's "Compassionate Financing" program. TPMC manages the REOs purchased using the plaintiffs' investment.

83. **REO National, LLC** ("REO Nat'l) was registered with the State of Utah on January 6, 2009 with Krohn to act as the sole owner and manager. REO Nat'l is a subsidiary of TPMC which purportedly manages REIC's REOs, including, the rental, sale and management of such properties individually purchased using the plaintiffs' investment.

84. **The Financial Firm** ("TFF") was registered with the State of Utah on September 1, 2009 without disclosure as to ownership but with Earl to act as manager. TFF purports to offer REIC investors a more sophisticated approach to money management and real estate portfolio, including, an investor's own personal real estate banking system. Specifically, this includes REIC investors soliciting investment funds from third-party investors through self-directed IRAs and 401Ks in which are used to purchase REOs purchased using the plaintiffs' investment.

85. **The Companies, LLC** ("The Companies") was registered with the State of Utah on July 25, 2008 with Krohn and Earl as owners and managers. Krohn and Earl maintain an 80% equity stake in The Companies with a $20,000 combined capital contribution while the remaining 20% is based on $3 million of combined capital contributions by 108 investors. On December 30, 2009, Mike Krohn, REIC's Chief Financial Officer, acting for REIC on behalf of The Companies submitted a "Form D – Notice of Exempt Offering of Securities" with the United States Securities and Exchange Commission for the capital amount of $3,963,750. This

Amended Complaint

December 30, 2009 Form D notice represents it as a "New Notice" with the "First Sale Yet to Occur." This was a patent misrepresentation. Notably, this December 30, 2009 Form D notice was filed at least seven months after the plaintiffs interest in JDK was reinvested and converted to "stock" in The Companies. On January 11, 2010, Mike Krohn, REIC's Chief Financial Officer, acting for REIC on behalf of The Companies submitted a "Form D 15-2 – Rule 506" application with the Utah Division of Securities for the capital amount of $3,963,750. Again, this was submitted at least eight months after the initial offering. On April 28, 2010, Mike Krohn, REIC's Chief Financial Officer, acting for REIC on behalf of The Companies submitted an amended "Form D – Notice of Exempt Offering of Securities" to the United States Securities and Exchange Commission. The amended Form D submitted by Krohn requests an exemption under Rule 506 for an offering up to $6,629,980 with $362,724 actually raised. Again, this was a patent misrepresentation given the above facts. Prior to the plaintiffs' Complaint, disclosure of this offering has not been made to any of REIC's existing or prospective investors. The Companies was registered for the express purpose of promoting, offering, and selling securities to the public at large through stock or pooled interests in bulk REOs. Such public securities offerings include the investment offering made to the plaintiffs in April 2009 by the defendants. In this transaction the plaintiffs were purported to receive such "stock" ownership in The Companies in exchange for converting their interest in JDK and the REO Investment. Krohn compared this to "buying the kitchen that made the pies." Prior to the plaintiffs' Complaint, disclosure of this offering has not been disclosed to the public. In a letter dated March 9, 2010 from Earl to the plaintiffs and other investors, it is represented that The Companies is the flagship company under which all other companies, including REIC, are owned. Perhaps a technical reality, this representation runs contrary to the defendants' public marketing and branding of REIC. The Companies is used by

the defendants to raise investor funds in turn used to purchase the REOs held and disposed of by the other entity defendants.

86. **JDK Investment Group, LLC** ("JDK") was registered with the State of Utah on April 21, 2008 with Krohn, John Sorensen and Dave Kaplar to act as owners and managers with a combined 75% ownership stake in return for a $11,000 total capital contribution. JDK was registered for the express purpose of soliciting investor funds from the public by REIC to invest in REOs in exchange for "stock." Notably, JDK like The Companies is a limited liability company and incapable of issuing stock. JDK was used by the defendants to raise investor funds in turn used to purchase the REOs held and disposed of by the other entity defendants.

87. **Beta Real Estate Holdings, L.P.** ("BREH") was registered with the State of Delaware on May 15, 2009 with one or more of the defendants believed to be the general partners and owners. On May 27, 2009, Mike Krohn, the Chief Financial Officer for REIC, submitted a "Form D-Notice of Exempt Offering of Securities" to the United States Securities and Exchange Commission. The Form D submitted by Krohn requests an exemption under Rule 506 for an offering up to $9,800,000. Prior to the plaintiffs' Complaint, disclosure of this offering has not been disclosed to the public. BREH is a subsidiary of its parent company REIC and is used to hold and transfer the REOs purchased by the plaintiffs' investment.

88. **Gamma Real Estate Holdings, L.P.** ("GREH") was registered with the State of Delaware on August 7, 2009 with one or more of the defendants believed to be the general partners. On January 1, 2010, Mike Krohn, the Chief Financial Officer for REIC, submitted a "Form D-Notice of Exempt Offering of Securities" to the United States Securities and Exchange Commission. The Form D submitted by Krohn requests an exemption under Rule 506 for an offering up to $9,800,000. Prior to the plaintiffs' Complaint, disclosure of this offering has not

been disclosed to the public. GREH is a subsidiary of its parent company REIC and is used to hold and transfer the REOs purchased by the plaintiffs' investment.

89. The recent federal and state capital raising activities under Reg D Rule 506 by the elaborate network of companies owned by Krohn, Earl, and REIC totals no less than $30,193,730. Containing strict investor qualification, disclosures, and marketing prohibitions, the frequency of such offerings gives rise to serious concerns relating to the Defendants' past and current capital raising activities. On December 8, 2010, REIC publicly announced the United States Securities and Exchange Commission was conducting an investigation into the securities activities of REIC and its affiliates.

## ADDITIONAL FACTS PARTICULAR TO THE PLAINTIFFS

90. In addition to the above facts, the plaintiffs incorporate the following facts.

### (Facts Particular to Terry and Kristie Webb ("Terry" or "Kristie"))

91. Terry and Kristie first learned about REIC, Krohn, Earl and other defendants from their son Travis in mid-April 2008.

92. After being told by Travis REIC was looking for investors to invest in deeply discounted homes, they agreed to meet with Krohn to learn more.

93. On or about April 18, 2008, Terry and Kristie met with Krohn at Krohn's REIC office located at 1070 East 800 North, Orem, Utah 84057 to be pitched the Fannie Mae REO investment transaction. Also in attendance at the pitch meeting were Travis Webb and Kristy Webb and another prospective investor identified as Dan Johnson.

94. The parties at the April 18, 2008 were told by Krohn that he had a friend named John Sorenson with an inside connection to Fannie Mae. Krohn explained that through Sorenson he had learned Fannie Mae was in the process of liquidating hundreds of homes at up to 90%

discounts below fair market value and Krohn needed to raise two to three million in investor funds within a few days to purchase the Fannie Mae REOs in bulk. Krohn went on to explain that his REO investment strategy was used during the great depression by the Rockefeller family to become fabulously wealthy. Krohn further represented that Terry and Kristie's investment in the Fannie Mae REOs would technically be a stock investment in JDK Investment Group, LLC and would be for no more than a year. Krohn represented that Terry and Kristie would at a minimum double their money. The pitch meeting ended with Krohn telling Terry and Kristie they had a day to decide whether they wanted to invest in the Fannie Mae REO transaction.

95. On or about April 26, 2008, Terry and Kristie invested $100,000 by delivering a Cashier's Check in the same amount to REIC, Krohn, and other defendants.

96. At the time of investment Terry and Kristie were not given an LLC operating agreement; nor were they told what percentage of share ownership interest in JDK their investment reflected; nor were they provided an investment contract or any disclosures of material information as to their investment.

97. After a year, Terry and Kristie still had not received their investment back and, other than a 2008 K1 statement indicating a net loss, had not received any information about the Fannie Mae REO transaction. Out of concern they approached the defendants about their investment status.

98. On April 26, 2009, Terry, Kristie and Travis setup another meeting with Krohn at Krohn's REIC office located 1070 East 800 North, Orem, Utah 84057.

99. At the April 26, 2009 meeting Krohn told them the Fannie Mae REO transaction had not gone as well as he promised, but, that they had made a 28% return (this contradicted their 2008 K1 which reflects a net loss on the year). Krohn further explained that he had learned a new

long-term investment method involving the REO Investment and would offer Terry and Kristie the opportunity to invest in this new investment transaction on the ground floor. The new investment transaction as Krohn explained it consisted of holding onto REOs purchased from third parties and then fixing the homes up to rent and then eventually resell. Terry and Kristie asked if they could have their original investment back at that time. Krohn said that if they pulled their original investment out at that time they would forfeit the 28% return. Kristie asked Krohn if they could leave their original $100,000 invested with REIC and get back the 28% profit. Krohn refused to accept this arrangement. Instead, Krohn said he would drop the price of stock in The Companies, LLC from $40 per share to $10 per share. Kristie then asked if Krohn could give them $128,000 worth of stock in The Companies, LLC. Krohn replied that they could only receive $100,000 worth of stock in The Companies. This did not make sense to Terry and Kristie and ultimately felt they had little choice but to remain invested in the new transaction. Krohn said this new investment transaction would require a five to eight year commitment. Specifically he told Terry and Kristie that the defendants would use investment returns through rental income to purchase more properties at deep discounts and then about the two year mark would distribute profits to the investors. To close Terry and Kristie on reinvesting, Krohn used the analogy that in reinvesting Terry and Kristie were "buying the kitchen that made the pies while others down the road would only own the pies made in the kitchen."

100.     At the prospect of losing the profits they had earned to that point, Terry and Kristie let their original investment remain with the defendants. This came as a significant hardship since health problems existed in their family and had explained to Krohn the need to get some of their investment back in order to cover such medical expenses.

101.    At the time of converting the REO Investment to The Companies, Terry and Kristie were not given an LLC operating agreement; nor were they told what ownership interest percentage in The Companies their investment reflected; nor were they provided an investment contract or any disclosures of material information as to their investment in REIC. The only thing they received to memorialize their reinvestment was a stock certificate printed on card stock and much later a 2009 K1 statement indicating a loss.

102.    After complete lack of communication from the defendants regarding their reinvestment, Terry and Kristie sent a letter to the defendants dated November 17, 2010 demanding their investment be returned and outlining the securities violations associated with the investments promoted, offered and sold to Terry and Kristie by the defendants. In response to the demand letter and subsequent communications, the defendants have refused to return Terry and Kristie's investment funds and threatened them with a lawsuit for defamation and breach of The Companies operating agreement if the above facts are brought to light.

**(Facts Particular to Travis and Kristy Webb ("Travis" or "Kristy"))**

103.    Travis originally met Krohn through a mutual acquaintance in October 2007. This introduction took place at Krohn's office located 1070 East 800 North, Orem, Utah 84057. At the time, REIC had just been registered by the defendants. Prior to REIC, Krohn was partnering with investors by using investors' money or credit to purchase real estate assets. Krohn would manage the investment for a fee and upon selling the investment Krohn and the investor would split the profits. Upon forming REIC, Krohn started consulting with investors and counseling them on how to invest in real estate.

104.    At this initial meeting, Travis and Kristy paid Krohn $3,000 to join REIC as "club members." This membership purported to entitle them to coaching from Krohn, access to

Krohn's investing team (consisting of Krohn as the game planner, Strategic Lending to finance investments, The Real Estate Firm to find homes, property management). Importantly, Krohn, individually and for REIC, offered to completely manage Travis and Kristy's investments for a fee split.

105.    For the next several months, Travis and Kristy met at Krohn's office for coaching sessions. As part of Krohn's consulting process, Travis and Kristy disclosed sensitive financial information regarding assets, savings and retirement accounts. In particular, Krohn learned through this process the Webb family had funds coming in through the sale of a business. Krohn advised Travis and Kristy to refinance existing properties in order to create liquid funds. Such funds would then be used to leverage the purchase of more properties. The additional properties under Krohn's strategy were to be leased out. Krohn told Travis and Kristy not to worry about whether the additional properties purchased initially had a positive cash flow because over time the property's appreciation would eventually overtake any negative cash flow. How Travis and Kristy would make up for the negative cash flow was not discussed. Travis and Kristy met off and on with REIC concerning their lease-option investments between November 2007 and April 2008

106.    On or about April 18, 2008, Travis received an unexpected phone call from Krohn about investing in national real estate deals. Krohn told Travis that he was only letting a few people know about the deal.   Krohn also said it would be a really big deal and that only individuals with enough money could invest.

107.    As explained by Krohn, the transaction involved purchasing pools of REOs from banks. Krohn emphasized that billionaires like John Rockefeller used this strategy during the Great Depression. Krohn explained to Travis that he learned of the investment through a

Amended Complaint

personal source connected to Fannie Mae named John Sorenson and that he needed to put together about two to three million in investor funds within a week. Krohn stated that investors would own the pooled homes that were purchased by Krohn and the other defendants. The homes to be purchased according to Krohn consisted of two main pools. One pool was located in Ohio and the other in Michigan. In addition to these two main pools, there was also to be a few smaller pools of homes scattered throughout the Midwest. According to Krohn, over three hundred homes were to be purchased. The homes according to Krohn were to be purchased at 82% or more below fair market value.

108.    Krohn assured Travis the homes would be inspected by a team of specialized home inspectors consisting of REIC employees. This was to happen within a four day window of marathon inspections in which a few REIC employees would fly out to location and inspect the homes. According to Krohn, based on the expected purchase price in the worst case scenario, investors in the Fannie Mae REO investment transaction would at a minimum double their money and possibly much more. The plan as Krohn stated was to purchase and resell the REOs purchased within nine months. As part of the investment, Krohn told Travis that he would own a percentage of the homes purchased and that he would receive stock in JDK Investment Group, LLC.

109.    Krohn asked Travis if he knew of any other investors that might be interested and suggested Travis speak with his family about investing because it was such a good deal.

110.    Shortly after this phone call Travis spoke with his family about the investment as described by Krohn. The inspectors purportedly flew out to inspect the homes and returned with a favorable report.

111.     On or about April 24, 2008, Travis invested $125,000 with Krohn and other defendants along with the investment of his family members.

112.     In early May 2008 Travis contacted Krohn to check if the REOs had been purchased. Krohn indicated that they had not yet been purchased and that things were taking longer than expected. Krohn also indicated they were only purchasing the Ohio pool of homes because the others contained so many bad homes and also because he had not raised enough funds to purchase the other pools. Krohn also indicated that the Ohio pool had some bad homes but that they could sell the junk homes to third-party investors looking to flip homes and could still double the investors' money in doing so. Krohn went on to say that some of the homes were so bad that they were unsellable and would need to be donated to charities like Habitat for Humanity for a deduction.

113.     Travis continued to check-in on a monthly basis regarding the investment status. For a few months he was told by Krohn that the defendants were trying to figure things out because there was so much paperwork due to Fannie Mae rules. Travis continued to press Krohn and the defendants for more detailed information and was told they were working on sending out additional details through an email or website content update.

114.     In September 2008, Travis contacted Krohn about an update. During this conversation Krohn told Travis that he couldn't answer any more questions because he didn't have time to answer investor questions and that he would send out emails and provide web updates.

115.     In early 2009, Travis and Kristy received a K1 statement from REIC relating to the REO Investment. The 2008 K1 statement showed a loss. When questioned, Krohn told Travis that they adjusted to show a loss for tax purposes but that the investment was in good shape.

116.     As time passed, Krohn and the defendants continued to lower their estimates of investor returns. From the initial discussion with Krohn in April 2008, the profit representations from the defendants started at 100% and gradually decreased to 70% to 50% to a stated realized 28% profit in March 2009.

117.     On March 26, 2009, Travis went to meet with Krohn again at Krohn's REIC office located at 1070 East 800 North, Orem, Utah 84057 about the REO Investment transaction. In attendance at this meeting were Travis, Terry, Kristie and Krohn. Travis was frustrated because he had not received any updates for a few months and felt this was a sign the investment was not going well. At this point he still had not received any information relating to the individual REOs purportedly purchased by the defendants and that any information passed on so far was general and blue sky in nature. Despite the defendants' blue sky assurances, there was no sign of progress and things appeared to be behind schedule. At this point in time, Travis and his family still had no idea what had been purchased, resold or where their money had gone or been used for.

118.     At the March 26, 2009 meeting Krohn admitted that the REO Investment transaction had not gone as planned but that they were still in great shape. He indicated that Travis and his family could get their money back with the 28% profit or they could turn their original principal into stock in "The Companies, LLC" and move to a new plan where he and his family would receive passive income beyond their imagination. The "new plan" as described by Krohn included a hold pattern in which the REO homes purchased would be fixed up and rented out generating pure cash flow while waiting for the real estate markets to bounce back to former levels. Krohn stated the homes could still be resold for 30% more than they were worth two years ago if they didn't become too attached to passive income.

Amended Complaint

119.       Krohn went on to state that the new plan would take no more than five to eight years while waiting for the real estate markets to rebound but that in the mean time they would start receiving rental income as soon as they could no longer buy homes at deep discounts. Krohn predicted they would start receiving passive income within two years. All of the income would go towards purchasing more discounted homes so there would be that much greater of a return at end. As Krohn put it, the new deal would provide Travis and Kristy with passive income. This passive income would repay their original investment and then at the end they would still own the original REOs purchased plus others purchased. At that point, they could keep some or all of the homes purchased and sell the rest.

120.       On March 27, 2009 Travis again met with Krohn at Krohn's REIC office in Orem, Utah. In attendance at this meeting were Travis, Kristy, Kamberly, Louise and Krohn. At this meeting Krohn effectively repeated what had been discussed in the meeting the day before, that the REO Investment transaction had not gone well, but, that he had learned a new investment strategy that would provide more passive income than they knew what to do with. Krohn said he would pay their money back with the 28% profit or they could reinvest their original principal in the new investment deal he had in the works.

121.       Disappointed the REO Investment had not gone as promised and looking for a way to make the original investment a success, Travis reluctantly agreed to remain invested by converting his "stock" to "The Companies, LLC." A simple stock certificate printed on card stock is all Travis has received from the defendants concerning his converting to the "new plan."

122.       In August 2009, Travis finally received a list of the homes originally purchased. Many of the homes purchased are located in blighted neighborhoods located near boarded up homes in depressed economic regions.

123.     Travis and Kristy have never received corporate information relating to any of the corporate defendants. Other than annual K1s, they have never received any detailed information as to their investments or REO homes. Not surprisingly, they have never received any rental income from the defendants. To date they have no idea if their investment is losing money, whether the defendants are purchasing more homes, where the investment funds have been allocated or revenue generated from the investment is being applied. In fact, they have no idea if their money is actually invested in the REOs or funding the defendants' payroll.

124.     On or about July 22, 2010, Travis went to REIC and asked to speak to Krohn about the status of his investment. Travis was referred to Kevin Clayson instead. Clayson essentially told Travis that he needed to be patient and that he would have to speak with Krohn and Earl to get his investment funds back, but that this was unlikely.

125.     Shortly after this meeting, Travis and Kristy were at The Home Depot located in Lindon, Utah and ran into Trent Rogers (manager for REIC's REO National division). When asked by Travis and Kristy about the status of the REO pool and new investment in The Companies, Rogers told Travis and Kristy that the investment was going great and that Krohn had a "vision" for REIC and affiliated companies in which passive income from REIC's investments would support the operating costs of REIC.

126.     On or about September 15, 2010 Travis went back to REIC and asked for copies of any investment contract, operating agreement or other documents that would indicate what his obligations to REIC were and his rights. Such information had never been provided to Travis and Kristy. Travis met again with Clayson. Clayson indicated to Travis he would need to come back in to sign paperwork relating to the allocation of his investment in The Companies stock. Clayson also told Travis that while he couldn't give him his investment money back, he could

sell Travis properties that were cash-flowing at least $700 a month at a discounted price. Clayson's description led Travis to believe these properties constituted the same REOs his original investment was used to purchase.

127.    As of today, Travis' 2009 K1 statement indicates a 12% net loss of his original investment instead of the 28% represented by Krohn. He has never received any passive income.

128.    In October 2010, after Travis and Kristy's real estate investments structured with the assistance of REIC started to unravel, Travis and Kristy met with Krohn to discuss the status of their investments. Krohn's conclusion was for Travis and Kristy to attend "life" coaching to resolve their negative attitudes and broken personalities. Travis and Kristy at Krohn's suggestion paid roughly $8,000 for this life coaching. This "life" coaching took place through Krohn's company called "Soul Purpose" through Life Mastery Systems, LLC. Essentially, the life coaching redirects an investor's investment failures away from Krohn's Strait Path System to an investor's represented broken personality. After a few sessions, Travis and Kristy thought the life coaching through Life Mastery Systems, LLC was a complete waste of time and money and ended the sessions.

129.    Finally, out of frustration over the complete lack of communication and lack of access to information material to their investment, Travis and Kristy sent a demand letter to REIC and other defendants on November 17, 2010. Their demand was for the return of their investment principal, interest, attorney fees and costs pursuant to Utah Code Ann. § 61-1-22(1)(b) for pre-litigation settlement. Notably, Travis and Kristy's demand was significantly less than that allowed by U.C.A. § 61-1-22. In response to Travis and Kristy's demand letter, the defendants denied any security offerings or transactions occurred and threatened to counter sue

Travis and Kristy for defamation and breach of REIC's operating agreement (which they had never seen at that point in time) if they attempted to recover their investment through litigation.

130.     On December 8, 2010, a request was sent to the defendants' to forward all material investment disclosures they believe were provided to Travis and Kristy in association with their investment with REIC. The defendants' effectively indicated that any such information would be addressed during the discovery process after litigation commenced.

131.     In light of the defendants' absolute resistance to cooperate and refusal to amicably resolve past securities violations, Travis and Kristy are left with no choice but to file this complaint with its attendant costs and expenses.

**(Facts Particular to Kamberly Webb ("Kamberly"))**

132.     Kamberly originally learned of REIC, Krohn, Earl and other defendants in mid-April 2008 from Travis. At the time, Kamberly was in San Francisco on vacation. After briefly hearing about REIC and the Fannie Mae REO investment transaction offered by the defendants, Kamberly received a phone call from her mother saying that if she wanted to invest she had one day to make the decision.

133.     Relating to the Fannie Mae REO investment transaction, Kamberly was told the defendants purchased homes at 82% discounts and then resold the homes at fair market value. Kamberly was told her investment would be for one year and that she would at a minimum double her money.

134.     On or about April 24, 2008, she delivered approximately $50,000 to Krohn, Earl and other defendants through a Cashier's Check. The investment was originally made in exchange for stock in JDK Investment Group, LLC.

135.     At the time of investment Kamberly was not given an LLC operating agreement; nor was she told what stock percentage in JDK her investment reflected; nor was she provided an investment contract or any disclosures of material information as to her investment in the REO Investment, REIC and other defendants, how her money had been invested, the status of investment, properties purchased, condition of title, profit/loss, management fees, investment fees, etc. Nor did she receive, other than a 2008 K1 statement indicating a loss, any updates as to the REO Investment's progress.

136.     On April 27, 2009, Kamberly scheduled a meeting with Krohn at Krohn's office located at 1070 East 800 North, Orem, Utah 84057 to discuss the status of the REO Investment. Kamberly, Travis, Kristy and Louise attended this meeting with Krohn.

137.     Krohn expressed his regret that Kamberly was among the guinea pigs relating to the defendants' REO Investment. At this meeting she was told by Krohn that if she pulled her money out she would only make a 28% return but if she kept the money invested she would as Krohn put it, "own the kitchen that made the pies." Krohn further told Kamberly at this meeting that since doing the REO Investment he had learned new things that could give her along with other investors an even higher rate of return. Krohn stated that because Kamberly was one of the original investors in the Fannie Mae REO investment transaction that had helped him learn from the first investment, he wanted to offer her an even better deal. This meant as Krohn put it, being an "owner of the kitchen that was producing the pies." Krohn went on to explain the "pies" represented his new investment scheme. He further stated that Kamberly wouldn't see her investment returned for five years, but at that time the rate of return would be much higher. As part of remaining invested, Kamberly's interest in JDK stock was to be converted into The Companies stock.

138.     At the time of converting to The Companies, Kamberly was not given an LLC operating agreement; nor was she told the number of shares in The Companies her investment reflected; nor was she provided an investment contract or any disclosures of material information as to her investment in The Companies, REIC and other defendants. The only thing she has received to memorialize her reinvestment is a stock certificate printed on card stock and a 2009 K1 statement indicating a loss.

139.     After requesting a return of her investment principal on November 17, 2010, she has been threatened by the defendants with a defamation and breach of operating agreement lawsuit if these facts are brought to light.

### (Facts Particular to Louise Webb ("Louise"))

140.     Louise first learned of Krohn, REIC and other defendants in mid-April 2008 through Travis. She was told that Krohn, REIC and its partners purchased homes at 90% discounts and then quickly resold them for fair market value. She was told that Krohn needed investment funds to purchase a pool of foreclosed homes owned by a bank and the homes were being purchased as much as 90% below fair market value. She was also told that the investment would be for less than a year and would double her investment in that time.

141.     On or about April 26, 2008, Louise delivered approximately $20,000 to Krohn, Earl and other defendants through a Cashier's Check for the Fannie Mae REO investment transaction. The investment was made in exchange for stock in JDK Investment Group, LLC.

142.     At the time of investment Louise was not given an LLC operating agreement; nor was she told prior to investing the number of shares she would receive in JDK; nor was she provided an investment contract or any disclosures of material information as to her investment with Krohn, REIC and other defendants, how her money had been invested, the status of

investment, properties purchased, condition of title, profit/loss, management fees, investment fees, etc. Nor did she receive, other than a 2008 K1 statement indicating a loss, any updates as to the investment progress.

143.     When the one year mark approached she grew concerned and scheduled a meeting with Krohn at Krohn's REIC office located at 1070 East 800 North, Orem, Utah 84057. This meeting took place on April 27, 2009 and was also attended by Travis, Kristy and Kamberly. Krohn told those present that their original investment was being converted into a bigger one and that if she wanted her original investment back she would forfeit the profits earned to that point. Krohn further told her the new investment deal would probably take two to five years but that she should start seeing monthly dividends in a couple years. She was further told by Krohn that some of the homes that were rentable had been rented and that it wouldn't take long to pay back her investment through profit sharing in rent proceeds. Krohn referenced the Great Depression and how the Rockefellers became wealthy buying discounted properties.

144.     At the time of converting to The Companies, Louise was not given an LLC operating agreement; nor was she told the number of shares in The Companies her investment reflected; nor was she provided an investment contract or any disclosures of material information as to her investment in REIC. The only thing she has received to memorialize her reinvestment is a stock certificate printed on card stock and a 2009 K1 statement indicating a loss.

145.     To date, Louise has never received any profit sharing and has not had her investment returned. After making demand for the return of her investment funds, the defendants have threatened her with a defamation and breach of operating agreement lawsuit for bringing these facts to light.

## COUNT I: FEDERAL SECURITIES VIOLATIONS

Amended Complaint

**(Krohn & REIC)**

146.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 145 as set forth herein.

147.     The defendants have engaged in the unlawful offer, sale and promotion of unregistered securities using fraudulent misrepresentations, misstatements of material facts, and omissions of material facts through means of interstate commerce in violation of the federal 1933 Securities Act ("Securities Act"), 1934 Exchange Act ("Exchange Act") and rules promulgated by the United States Securities & Exchange Commission ("SEC").

**(Security)**

148.     Under the Securities Act, Exchange Act and rules promulgated by the SEC, a "security" among other things means an investment transaction where a profit expectation to come from the managerial efforts of a third party exists. The investments promoted, offered and sold to the plaintiffs by the defendants gave rise to a profit expectation to come from the defendants' managerial efforts constituting a "security" as this term is defined and applied under the Securities Act, Exchange Act and rules promulgated by the SEC.

**(Scienter)**

149.     The circumstances and facts gives rise to a strong inference the defendants Krohn and REIC intentionally made misrepresentations, misstatements of material facts and omissions to the plaintiffs and investors. The facts and circumstances supporting a strong inference of scienter are as follows:

        a.   In a May 7, 2008 email using his REIC account, relating to the REO Investment and JDK, Krohn represented to the plaintiffs and other investors that Krohn,

Sorenson and Kaplar had invested $300,000 of their own personal funds in the REO Investment and JDK. This representation is patently untrue. The JDK corporate records indicate Krohn, Sorenson and Kaplar collectively invested a total of $11,000 while taking a 75% equity stake with the remaining 25% stake based on a grossly disproportionate combined $1.5 million in investor funds. Krohn would have had direct knowledge concerning the falsity of this statement since JDK was formed on April 21, 2008 and this statement was made on May 7, 2008. Krohn's May 7, 2008 email patently misrepresenting the capital contribution of Krohn, Sorenson and Kaplar was done at a time these three individuals were taking a 75% ownership stake in JDK for a mere $11,000 while the plaintiffs and other investors split a meager 25% stake pro-rata in return for a combined $1.5 million contribution. It also came at a time the investors, including the plaintiffs, made their investment decision or had recently made their investment decision. The capital contribution of Krohn, Sorenson and Kaplar was material to the REO Investment investors since it related to their equity position, profit potential, control over the investment and ultimately making an informed investment decision. This supports the inference that Krohn, individually and for REIC, acted with scienter to deceive the plaintiffs and JDK investors relating to their immediate dilution of investment value. This deception skewing the initial benchmark value also carried over to the plaintiffs' and other investors' perception of their investment value as part of the lulling and conversion to The Companies.

b.  On April 23, 2008, Krohn (again using his REIC email account) sent an email to

the plaintiffs and other prospective investors in the REO Investment representing that REIC had sent staff members to Ohio and Michigan who would be able to thoroughly inspect, take pictures and verify CMA valuations of 202 homes by Tuesday of the following week. Krohn's April 23, 2008 email led the plaintiffs and the other REO Investment investors to believe REIC and its staff members **a)** were legally licensed and qualified to appraise and inspect residential properties in Ohio and Michigan and **b)** that in the span of 6 days, 202 (later in a May 2, 2008 email stated at 300 by Krohn) homes in two different states, or 33.5 homes per day on average, could be thoroughly inspected and accurately appraised. Krohn's representations in the April 23, 2008 email were obviously false and reckless. Krohn would have either had direct knowledge that the REIC "staff" members sent to Ohio and Michigan were not licensed inspectors or appraisers in Ohio and Michigan or made with a reckless indifference to the truth. The same would apply to the ability to physically inspect and appraise 33.5 homes per day with any degree of thoroughness to make an informed investment decision. REIC and its staff members' lack of licensure in Michigan and Ohio to appraise and inspect real property likely violates Michigan and Ohio law. Conversely, omitting to disclose the REIC staff were not licensed appraisers and inspectors was material as it related to the accuracy of the underlying investment valuation, potential investment return and making an informed investment decision. Krohn's April 23, 2008 email and misrepresentations and misstatements and omissions of material fact concerning the ability to legally, accurately and thoroughly inspect and appraise the REOs was made in the day(s) immediately before the plaintiffs'

and other JDK investors were making their investment decision supporting the inference that Krohn, individually and for REIC, intentionally made such misrepresentations in order to close the deal and secure their investment.

c.   On May 2, 2008, Krohn sent an email to the plaintiffs and other JDK investors from his REIC email account. In this email Krohn stated REIC had thoroughly researched and physically inspected over 300 homes in Michigan and Ohio and were in the process of determining the value of the properties purchased. This May 2, 2008 email from Krohn directly contradicts his April 23, 2008 representation that REIC would accurately appraise the value of the REOs. In this May 2, 2008 email Krohn unwittingly admits that after purchasing the REOs, REIC was after the fact in the process of "determining the value of the homes" purchased. This was a direct admission that despite earlier representations REIC in fact had not appraised the value of the homes. The misrepresentation that the home values had been appraised and omission that the homes had not been appraised prior to purchase was material as it related to accuracy of the underlying investment valuation, potential investment return and making an informed investment decision. Krohn's May 2, 2008 email was made at a time the investors, including the plaintiffs, were making their investment decision or had recently made their investment decision and supports an inference Krohn, individually and for REIC, made this misrepresentation with the intent to induce an investment or lull the plaintiffs and other JDK investors to remain invested.

d.   Krohn's 2008 Gold Refinery Offering to the plaintiffs illustrates a pattern by Krohn, individually and for REIC, recklessly making speculative unregistered

investment offerings to the public without providing disclosures or taking measures to ensure investors are accredited. It also illustrates Krohn's reckless indifference as to what "intense due diligence" entails, i.e. private placement memorandum or registration statement, for an unaccredited investor and suitability in unregistered securities.

e.  Krohn's 2nd 2008 REO Offering to the plaintiffs further illustrates and supports a pattern by Krohn, individually and for REIC, recklessly making speculative unregistered investment offerings to the public without any disclosures or accredited investor verification or investment suitability.

f.  In an April 13, 2009 email to the plaintiffs, Krohn admits that REIC's CEO (Earl) and CFO (Mike Krohn, Krohn's brother) were working on acquiring new investors to fund a buyout of old investors and conversion from JDK to The Companies. At the same time Krohn contradicted himself by telling the plaintiffs and the JDK investors that they had realized a 28% return on the REO Investment. In other words, while telling investors they had realized a 28% return on the REO Investment, Krohn represented there was not enough available cash to pay out all the investors. The solution according to Krohn was to encourage as many investors possible to remain invested by converting their REO Investment to The Companies while also bringing on new investors. One of the ways Krohn did this was by circulating a "Business Plan" bearing the REIC name to the plaintiffs and other JDK investors in April 2009 which represented $100,000 invested in 2009 would be worth $5 million by 2014. Krohn and REIC's "Business Plan" is not grounded in fact and is nothing more than a reckless blue

sky projection intended to lull the plaintiffs and investors to remain invested and induce prospective investors to invest. Krohn also represented to the plaintiffs in his April 13, 2009 email that The Companies had agreed to purchase his own personal REO investments with cash and stock. Importantly Krohn omitted to disclose to the plaintiffs and other JDK investors what was being purchased, the fair market value, the specific terms and that The Companies had been formed by Krohn and Earl and was not a neutral third-party company dealing at arm's length. Instead, The Companies was a company formed and owned by Krohn and Earl who collectively assumed an 80% equity stake after raising $3 million in investor funds while only contributing $20,000 themselves. In other words, Krohn and Earl used the plaintiffs' and other JDK investors' investment funds to buy Krohn's own personal REOs in which Krohn and Earl received an 80% ownership equity stake without putting any of their own money down in the first place. Such misrepresentations and omissions related to accuracy of the underlying investment valuation, potential investment return, self-dealing by Krohn, conflicts of interest and making an informed investment decision. Krohn's direct contradiction that the plaintiffs and JDK investors had made a 28% return (also contradicted by the JDK partner 2009 K1 statements evidencing a loss) but that their investment couldn't be cashed out gives rise to a strong inference that Krohn acted with scienter in order to self-deal and sell off his own personal REOs while retaining an exorbitant stake in The Companies with a mere $10,000 capital contribution of his own. The strong inference here is that Krohn, individually and for REIC, intentionally misrepresented and omitted to disclose there was never an

ability to payout because JDK investment had actually ended in a loss (supported by the investors' 2009 K1 statements) while at the same time Krohn was engaging in undisclosed self-dealing by dumping his own personal investments on The Companies, and Krohn and Earl were taking an undisclosed 80% equity stake in The Companies with a mere combined $20,000 of their own money down thru the original investment funds of the plaintiffs and other JDK investors.

g.   In April 2009 Krohn represented to the plaintiffs The Companies' stock was worth $40 per share, but, that he would sell the plaintiffs shares of The Companies for $10 per share if they remained invested. In other words, Krohn was directly representing to the plaintiffs that acquiring shares in The Companies would instantly be worth 3 times what was paid. Krohn's statement as to share valuation was not based on any formal share valuation thereby made falsely or with a reckless disregard for the truth. Krohn's statement regarding share valuation of The Companies was made at the same time he was telling the plaintiffs and other JDK investors there was not enough cash to refund everyone's investment and that "the most profitable move was to remain invested." Krohn's misrepresentations concerning share valuation and omissions that no formal valuation had occurred relates to accuracy of the underlying investment valuation, potential investment return and making an informed investment decision. This gives rise to the inference that Krohn, individually and for REIC, acted with scienter to misrepresent to the plaintiffs the actual share value of The Companies in order to induce the plaintiffs to remain invested thereby his own self-dealing and acquisition of a majority equity stake through a miniscule capital

contribution.

**(Fraudulent Statements; Misstatements of Material Fact; Omissions of Material Fact)**

150.     Under the Securities Act, a party commits a violation when a party promotes, offers or sells a security through a prospectus or oral communication and which includes an untrue statement of material fact or omits to state a material fact necessary to make the statement not misleading. *E.g.,* 15 U.S.C. § 77a, *et seq.* Further under the Securities Act, a party also commits a violation when they (1) employ any device, scheme, or artifice to defraud; (2) obtains money or property by means of any untrue statement of material fact or omission of a material fact necessary to make the statement(s) not misleading; or (3) engages in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser. *Id.*

151.     Under the Exchange Act, it is unlawful for a party in connection with the purchase or sale of a registered or unregistered security to use any manipulative or deceptive device in contravention to any rule(s) promulgated by the SEC. *E.g.,* 15 U.S.C. § 78a, *et seq.* Under one such rule, 10b-5 promulgated by the SEC, it is a violation for any party in connection with the purchase or sale of any security using interstate commerce or the mail from (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of material fact or omitting a statement of material fact necessary to make the statement not misleading; or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. *E.g.,* 17 C.F.R. § 240.10b-5.

152.     The defendants have violated the Securities Act and Exchange Act by employing fraudulent and deceptive devices, offered fraudulent misrepresentations, offered material misstatements of fact and omitted material facts in association with the promotion, offer and sale

Amended Complaint

of securities using means or instruments of transportation or communication in interstate commerce or by use of the mail, directly or indirectly.

153.     As part of the defendants' use of fraudulent or deceptive devices, fraudulent misrepresentations and material misstatements of fact in violation of the Securities Act and Exchange Act, the plaintiffs specifically incorporate the misrepresentations and misstatements of fact in paragraphs 22 through 65 herein, as well as the following:

   a.   In mid-April 2008, in a phone call initiated by Krohn to Travis Webb, Travis was told the REO Investment included homes purchased at 90% discounts below fair market values. This representation was patently false. Krohn later admitted in a May 2, 2008 email to the plaintiffs that the REO homes had not been appraised prior to the plaintiffs' investment and purchase of the actual homes. The homes actually purchased were in dilapidated conditions and located in economically depressed regions, many in unsellable condition. In an April 13, 2009 email, Krohn admits the REOs could not be flipped for the price paid. Further, while Krohn represented the REO Investment(s) were being purchased at "conservatively" a 90% discount from actual fair market value, the reality was the defendants had not conducted actual appraisals using a licensed appraiser. The 90% discount valuation represented by Krohn was based on unreliable websites. Krohn's misrepresentation, individually and for REIC, concerning the appraised valuation of the REOs was material as it related to the accuracy of the underlying investment valuation, potential

investment return, market conditions, investment risks, character of the investment promoters and making an informed investment decision.

b. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented that the investors in the REOs would at a minimum double their money in less than a year's time. This representation was based exclusively on blue sky speculation and with a reckless disregard for the absence of facts supporting such a guarantee. It has since been demonstrated to be patently false based on the JDK 2009 investor K1 statements. Krohn's misrepresentation, individually and for REIC, concerning a guaranteed investment return was material as it related to the potential investment return, suitability, investment timing, investment risks, character of the investment promoters and making an informed investment decision.

c. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented that the plaintiffs and other investors in the REOs would own the individual homes outright. This representation was patently untrue. The plaintiffs have never individually held title to the REOs purportedly purchased by the defendants. The plaintiffs did not receive a list of the homes purportedly purchased until early 2010 upon receiving their 2009 K1 statements from The Companies. Krohn's misrepresentation, individually and for REIC, concerning tangible collateral securing their investment through being on title to the REOs was

Amended Complaint

Page 54 of 87

material as it related to risk mitigation, suitability, character of the investment promoters and making an informed investment decision.

d. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented the prospective REOs would receive a thorough inspection and appraisal. This representation was patently untrue. The REIC staff members sent to Michigan and Ohio to inspect and appraise the homes were not licensed inspectors and appraisers. Moreover, the time frame would have required inspecting and appraising 33.5 homes per day by roughly a half dozen individuals. On May 2, 2008 Krohn admits the homes were purchased without being valued supporting the defendants purchased the REOs largely sight unseen hoping that the percentage of homes in good condition would outweigh any homes in unsellable condition. This investment vetting method was not disclosed to the plaintiffs. Krohn's misrepresentation, individually and for REIC, concerning legal ability to inspect and appraise the valuation of the REOs was material as it related to the accuracy of the underlying investment valuation, potential investment return, market conditions, investment risks, character of the investment promoters and making an informed investment decision.

e. In the same mid-April 2008 phone call between Krohn and Travis Webb, Krohn represented the REO Investment would be resold within nine months of investing. In essence, Krohn represented the ability to sell 300 homes located in in Michigan and Ohio within 9 months in a near

depression national economy at a price that would yield a net 100% investment return. This representation was based exclusively on blue sky speculation and with a reckless disregard for the absence of facts supporting such a guarantee.  The homes purchased were generally in a dilapidated condition and could not be sold for much if anything above what was paid. Many of the homes were subject to undisclosed tax liens. Two years later, the homes remain largely illiquid. Krohn has since admitted the homes could not be sold within the timeframe and for the investment return as originally represented and guaranteed. Krohn's misrepresentation, individually and for REIC, concerning the ability to sell 300 homes in 9 months in a near depression economy for prices yielding a net 100% investment return was material as it related to the accuracy of the underlying investment valuation, potential investment return, market conditions, investment risks, market conditions, investment timing commitment, character of the investment promoters and making an informed investment decision.

f.  In the limited information circulated by REIC and given to the plaintiffs at or about the time of their investment on April 24, 2008, it was represented that REIC and its affiliates that, as of 2008, REIC had averaged a 67% annual profit return over the past five years. This is a patent misrepresentation. REIC was registered as a limited liability company on October 26, 2007 in the State of Utah and had been in operation for less than a year at the time this representation was made. Krohn's

misrepresentation, individually and for REIC, concerning REIC's performance history was material as it related to profit expectation, investment risks, character of the investment promoters and making an informed investment decision.

g. In a meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn presented to the plaintiffs the REOs to be an investment in home foreclosure pools purchased at up to 90% below then current fair market values. This representation was patently false. Krohn later admitted in a May 2, 2008 email to the plaintiffs that the REO homes had not been appraised prior to the plaintiffs' investment and purchase of the actual homes. The homes actually purchased were in dilapidated conditions and located in economically depressed regions, many in unsellable condition. In an April 13, 2009 email, Krohn admits the REOs could not be flipped for the price paid. Further, while Krohn represented the REO Investment(s) were being purchased at "conservatively" a 90% discount from actual fair market value, the reality was the defendants had not conducted actual appraisals using a licensed appraiser. The 90% discount valuation represented by Krohn was based on unreliable websites. Krohn's misrepresentation, individually and for REIC, concerning the appraised valuation of the REOs was material as it related to the accuracy of the underlying investment valuation, potential

investment return, market conditions, investment risks, character of the investment promoters and making an informed investment decision.

h. In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the plaintiffs that the investors in the Fannie Mae REOs would at a minimum double their money in less than a year's time. This representation was based exclusively on blue sky speculation and with a reckless disregard for the absence of facts supporting such a guarantee. It has since been demonstrated to be patently false based on the JDK 2009 investor K1 statements indicating an overall loss. Krohn's misrepresentation, individually and for REIC, concerning a guaranteed investment return was material as it related to potential investment return, suitability, investment timing, investment risks, character of the investment promoters and making an informed investment decision.

i. In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the plaintiffs that investors in the REO Investment would be on title to REOs purchased. This representation was patently untrue. The plaintiffs have never individually held title to the REOs purportedly purchased by the

defendants. The plaintiffs did not receive a list of the homes purportedly purchased until early 2010 upon receiving their 2009 K1 statements from The Companies. Krohn's misrepresentation, individually and for REIC, concerning tangible collateral securing their investment through being on title to the REOs was material as it related to risk mitigation, suitability, character of the investment promoters and making an informed investment decision.

j.   In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the plaintiffs the prospective REO Investment, over 200 homes, would receive a thorough appraisal and inspection. This representation was patently untrue. The REIC staff members sent to Michigan and Ohio to inspect and appraise the homes were not licensed inspectors and appraisers. Moreover, the time frame would have required inspecting and appraising 33.5 homes per day by roughly a half dozen individuals. On May 2, 2008 Krohn admits the homes were purchased without being valued supporting the defendants purchased the REOs largely sight unseen hoping that the percentage of homes in good condition would outweigh any homes in unsellable condition. This investment vetting method was not disclosed to the plaintiffs. Krohn's misrepresentation, individually and for REIC, concerning legal ability to inspect and appraise the valuation of the REOs

was material as it related to the accuracy of the underlying investment valuation, potential investment return, market conditions, investment risks, character of the investment promoters and making an informed investment decision.

k.  In the same meeting held on April 18, 2008 at REIC's place of business located at 1070 East 800 North, Orem, Utah 84057 with Krohn, Travis Webb, Kristy Webb, Terry Webb and Kristie Webb and a prospective investor identified as Dan Johnson, Krohn represented to the plaintiffs the REO Investment would be resold within nine months of investing. In essence, Krohn represented the ability to sell 300 homes located in in Michigan and Ohio within 9 months in a near depression national economy at a price that would yield a net 100% investment return. This representation was based exclusively on blue sky speculation and with a reckless disregard for the absence of facts supporting such a guarantee. The homes purchased were generally in a dilapidated condition and could not be sold for much if anything above what was paid. Many of the homes were subject to undisclosed tax liens. Two years later, the homes remain largely illiquid. Krohn has since admitted the homes could not be sold within the timeframe and for the investment return as originally represented and guaranteed. Krohn's misrepresentation, individually and for REIC, concerning the ability to sell 300 homes in 9 months in a near depression economy for prices yielding a net 100% investment return was material as it related to the accuracy of the underlying investment

valuation, potential investment return, market conditions, investment risks, market conditions, investment timing commitment, character of the investment promoters and making an informed investment decision.

l.  In stock certificates delivered to each of the plaintiffs on or about April 26, 2008, Krohn, REIC and other defendants represent that the plaintiffs had received "stock" in JDK Investment Group, LLC. This is a patent misrepresentation and legal impossibility. JDK is a limited liability company organized in the State of Utah. As a matter of basic corporate law, JDK is incapable of issuing "stock" to any investor. Krohn's misrepresentation, individually and for REIC, concerning receiving "stock" ownership was material as it related to the accuracy of the underlying investment, the plaintiffs' statutory rights as shareholders, the corporate organization and associated statutory governance mandates, future tax consequences, character of the investment promoters and making an informed investment decision.

m.  In a May 7, 2008 email from Krohn to the plaintiffs, Krohn represented that he, Sorenson and Kaplar had made capital contributions to JDK totaling $300,000. This representation was patently false. The corporate records of JDK show that the three collectively only put $11,000 of their own money into JDK while taking a 75% equity stake. Krohn's misrepresentation, individually and for REIC, concerning contributing $300,000 of his own funds along with Sorenson and Kaplar was material as it related to the accuracy of the underlying investment, the investors'

equity to contribution ratio, the plaintiffs' statutory rights as shareholders, investment return expectation, character of the investment promoters and making an informed investment decision.

n.  In meetings held on March 26, 2009 and March 27, 2009 attended by the plaintiffs and Krohn, Krohn represented to the plaintiffs they had made a 28% profit on their investment in the home foreclosure pools. These representations were patently untrue. The plaintiffs' 2008 JDK K1 statements show an overall net loss in their investment. The plaintiffs' 2009 The Companies K1 statements show a 12% loss. Krohn's misrepresentation, individually and for REIC, concerning realizing a 28% profit when in fact they had netted an overall loss was material as it related to the accuracy of the underlying investment, the success of the investment, remaining invested by converting to The Companies, approaching regulatory authorities at an earlier stage, filing suit at an earlier day, investment return realized, character of the investment promoters and making an informed investment decision.

o.  In meetings held on March 26, 2009 and March 27, 2009 attended by the plaintiffs and Krohn, Krohn represented to the plaintiffs they could remain invested by converting to The Companies purchased at a 75% discount, would start paying out passive income within two years, and could pay off the plaintiffs' original REO Investment, the plaintiffs would own the homes free and clear at the conclusion of the investment and the plaintiffs would receive "stock" in The Companies, LLC in exchange for their

reinvestment. These representations were patently untrue. The plaintiffs have never received passive income distributions as promised. Any representation as to when any local and national real estate market returns to performing levels is speculative at best. The plaintiffs have never received any title ownership to the REO homes. The plaintiff's 2009 The Companies K1 statements state a 12% loss. And as a practical corporate matter, a Utah limited liability company is incapable of issuing "stock" to investors. Krohn's share valuation of $40 per share was not based on an actual valuation and made reckless without regard to the absence of any facts supporting such a representation. Krohn's misrepresentation, individually and for REIC, concerning remaining invested and converting to The Companies was material as it related to the accuracy of the underlying investment, investment equity, the plaintiffs' statutory rights as shareholders, the corporate organization and associated statutory governance mandates, future tax consequences, character of the investment promoters and making an informed investment decision.

p.   On an ongoing basis, the defendants represent to the plaintiffs and the public at large that Krohn individually owns over 400 homes and counting. This is directly contradicted by Krohn's April 13, 2009 representation that The Companies purchased Krohn's personal real estate investments through the plaintiffs' and other investors' funds also in the same transaction in which Krohn and Earl received an 80% equity stake. Krohn's misrepresentation, individually and for REIC, concerning his

personal real estate investments was/is material as it relates to the asset valuation underlying the plaintiffs' investment, investment return expectation, misuse and misappropriation of investment funds, self-dealing of corporate offices, character of the investment promoters and making an informed investment decision.

q.  It was represented to the plaintiffs by Krohn in the above communications and meetings with the plaintiffs occurring between 2008 and 2009 that the plaintiffs were part of a select and small group of investors allowed to invest with him in Ohio, Michigan and a few other states. This was a misrepresentation. The Investors are now aware of over a 108 investors solicited through offerings by REIC and other defendants through The Companies, BREH and GREH. Such offerings are evidenced by the Reg D 506 applications submitted to the SEC and Utah Division of Securities by BREH and GREH.  The investor funds generated is in the millions of dollars resulting in a drastic dilution of the plaintiffs' investment stake in REIC, The Companies and other defendants. Krohn's misrepresentation, individually and for REIC, concerning the number of participating investors was material as it related to the accuracy of the underlying investment, investment equity, the plaintiffs' statutory rights as shareholders, dilution of equity, investment return expectation, character of the investment promoters and making an informed investment decision.

Such misrepresentations and misstatements of material facts by the defendants were made with scienter, knowingly, intentionally, with reckless indifference to the truth, or with reason to know

of the falsity and further made with the intent to deceive the plaintiffs thereby inducing them to enter into unregistered fraudulent investment transactions.

154.    The defendants' material omissions in violation of the Securities Act and Exchange Act are, but not limited to, as follows:

a.  At the time of investment and since, no disclosures of material fact have been provided to the plaintiffs concerning JDK, The Companies, REIC, and the affiliate companies owned and controlled by the defendants. Specifically, the defendants at all times have omitted to disclose to the plaintiffs the following material facts: a) biographical history of REIC, JDK, The Companies and affiliates; b) executive bios and compensation; c) relevant personal and corporate bankruptcies; d) status of past or pending income tax issues; e) past or threatened litigation; f) risk analysis associated with investment; g) investment portfolio; h) local, regional, national and global market analysis; i) debt leverage status and analysis of the investments and REIC, JDK, The Companies and affiliates; j) detailed investment strategy; k) investment sourcing, screening, vetting and due diligence process; l) historical investment performance; m) historical profitability performance of REIC, JDK, The Companies and affiliates; n) investment performance benchmarks; o) investment commitment timeframe; p) risks associated with loss, illiquidity, condition of asset, preexisting liens and clouded title, etc.; q) geographic specific investment timeframe; r) articles of organization or incorporation, operating agreement or bylaws; s) investment agreements; t) accredited investor

verification and questionnaire; u) investment registration documents; v) analysis of prospective income tax consequences; w) scope, status, identity, and equity interest of other investor/owner involvement; x) possibility of investment dilution through additional investor involvement or debt issuance; y) right or lack thereof to prevent investment dilution; z) ability for assets acquired investor proceeds to be sold or transferred; aa) detailed historical financial performance of REIC, JDK, The Companies and affiliates including profit and loss reports; ab) ownership of title to assets; ac) investor role or lack thereof in investment and corporate management decisions; ad) investment description; ae) risk disclosures related to investing in REIC, JDK, The Companies and affiliates; af) risk disclosures related to investing in real estate based assets; ag) investment debt to equity ratio analysis; ah) debt to equity ratio of REIC, JDK, The Companies and its affiliates; ai) corporate governance structure of REIC, JDK, The Companies and affiliates; aj) detailed executive and management biographies, including past executive and management experience, background and education, and role in investment process; ak) corporate biography of REIC, JDK, The Companies and affiliates including philosophy, history, strategy and competitive advantages; al) costs associated with investment in real estate; am) corporate operating costs associated with REIC, JDK, The Companies and affiliates; an) past capital raising activities of REIC, JDK, The Companies and affiliates; ao) possibility of future capital raising activities of REIC, JDK, The

Amended Complaint

Companies and affiliates; and ap) intended use of investment funds by REIC, JDK, The Companies and affiliates. Such facts were material as they related to the plaintiffs analyzing and making an informed and educated investment decision based upon the actual investment description, company description(s), registration of investment, participation of other investors, tax consequences, risk factors, market conditions, pending litigation, assets and liabilities, capitalization, strength and experience of management, terms of the investment offering, profit expectation, allocation of proceeds, suitability, potential equity dilution, use of investment funds, suitability and historical financial performance instead of inflated blue sky projections.

b.  Concerning the REO Investment and JDK, the defendants omitted to disclose to the plaintiffs the REOs originally purchased were in economically depressed regional and local real estate markets and in many cases within neighborhoods consisting of boarded-up properties. These facts were material in that they related to analyzing the investment quality, profit expectation, risk associated with investing, other risks, investment security, asset liquidity, asset valuation, suitability, character of the investment promoters and in making an informed investment decision.

c.  Concerning the REO Investment and JDK, the defendants omitted to disclose the REOs originally purchased were not inspected and appraised by licensed inspectors and appraisers. This fact was material in that it related to analyzing the investment quality, profit expectation, risk

associated with investing, risks, investment security, asset liquidity, asset valuation, character of the investment promoters and in making an informed investment decision. Such facts were material in that they relate to analyzing the investment market(s), investment quality, profit expectation, risk associated with investing, other risks, investment security, asset liquidity, asset valuation, regulatory compliance, suitability, character of the investment promoters and in making an informed investment decision.

d.  Concerning the REO Investment and JDK, the defendants omitted to disclose that Krohn, Sorenson, and Kaplar had reserved a 75% voting equity stake in JDK for $11,000 total invested between the three while the remaining 25% non-voting equity stakes was based on $1.5 million invested. These facts were material in that they related to analyzing the equity to capital contribution ratio, profit expectation, investor control of assets and management, risk associated with investing, investment security, suitability, character of the investment promoters and in making an informed investment decision.

e.  Concerning the REO Investment and JDK, the defendants omitted to disclose to the plaintiffs that JDK as a limited liability company was incapable of issue "stock" ownership. This fact was material in that it related to analyzing the equity to capital contribution ratio, profit expectation, investor control of assets and management, risk associated

with investing, investment security, suitability, character of the investment promoters and in making an informed investment decision.

f.   Concerning the REO Investment and conversion to The Companies, the defendants omitted to disclose that Krohn and Earl reserved an 80% voting equity stake in The Companies for collectively investing $20,000 while the remaining 20% non-voting equity stake was based on $3 million invested. These facts were material in that they related to analyzing the equity to capital contribution ratio, profit expectation, investor control of assets and management, risk associated with investing, investment security, suitability, character of the investment promoters and in making an informed investment decision.

g.   Concerning the REO Investment and conversion to The Companies, the defendants omitted to disclose to the plaintiffs that the REO Investment had resulted in a net loss instead of the represented 28% net gain. This fact was material in that it related to analyzing investment performance, remaining invested, suitability, equity to capital contribution ratio, profit expectation, risk associated with investing, investment security, suitability, character of the investment promoters and in making an informed investment decision.

h.   Concerning the REO Investment and conversion to The Companies, the defendants omitted to disclose that Krohn and Earl had formed and owned The Companies while at the same time leading the plaintiffs and investors to believe The Companies was a neutral third-party in which Krohn and

Earl were dealing at arm's length to purchase Krohn's real estate investments. This fact was material in that it related to analyzing the use of investment funds, transactional terms, equity to capital contribution ratio, profit expectation, risk associated with investing, investment security, suitability, character of the investment promoters and in making an informed investment decision.

i. Concerning the REO Investment and conversion to The Companies, the defendants omitted to disclose to the plaintiffs the specific terms of the purchase of Krohn's personal investments by The Companies through investor funds, including purchase price, fair market value, terms of purchase. These facts were material in that they related to analyzing the use of investment funds, transactional terms, equity to capital contribution ratio, profit expectation, risk associated with investing, investment security, suitability, character of the investment promoters and in making an informed investment decision.

j. Concerning the REO Investment and conversion to The Companies, the defendants omitted to disclose to the plaintiffs that Krohn's share valuation of The Companies at $40 per share was not based on a formal share valuation analysis. This fact was material in that it related to analyzing the plaintiffs making an informed and educated investment decision based upon the actual investment description, company description(s), registration of investment, participation of other investors, tax consequences, risk factors, market conditions, pending litigation,

assets and liabilities, capitalization, strength and experience of management, terms of the investment offering, profit expectation, allocation of proceeds, suitability, potential equity dilution, use of investment funds, suitability and historical financial performance instead of inflated blue sky projections.

k.  Concerning the REO Investment and conversion to The Companies, the defendants omitted to disclose to the plaintiffs that The Companies would bring on an addition 90 investors thereby diluting the plaintiffs' equity position. This fact was material in that it related to analyzing the equity to capital contribution ratio, profit expectation, investment dilution, risk associated with investing, investment security, suitability, liabilities imposed due to the unique financial circumstances of the new investors, character of the investment promoters and in making an informed investment decision.

l.  Concerning the REO Investment and The Companies, the defendants omitted to disclose to the plaintiffs that no registration or exemption filings had been made to the SEC or State of Utah. This fact was material in that it related to analyzing statutory compliance, risk associated with investing, existence of investment information customarily disclosed in such filings, regulatory vetting,  legitimacy of the investment, character of the investment promoters and in making an informed investment decision.

m. Concerning the REO Investment and The Companies, the defendants omitted to disclose to the plaintiffs that the REOs originally purchased had

not migrated with them to The Companies and instead had been transferred to other entity defendants and were being managed, transferred and resold to other REIC investors. These facts were material in that they related to analyzing remaining invested, disposal of assets in relation to equity valuation, assets and liabilities, risk associated with investing, legitimacy of the investment, character of the investment promoters and in making an informed investment decision.

155.      The above omissions by the defendants were material to the plaintiffs' in that they related to making an informed investment decision based on a complete disclosure of facts relating to the investment offering(s).

**(Failure to Register)**

156.      The Securities Act and Exchange Act require an issuer or promoter of a security to file a registration statement prior to the promotion, offer and sale of a security to the public.

157.      The defendants identified have promoted, offered and sold securities to the plaintiffs.

158.      The defendants identified have not filed any registration statements concerning the securities promoted, offered and sold to the plaintiffs.

159.      The defendants' failure to file any registration statement constitutes a violation of the Securities Act and Exchange Act.

**(Promoters)**

160.      The defendants identified are considered "promoters" under the Securities Act and Exchange Act which define a "promoter" as an individual who acting alone or in concert

with another person, takes initiative in founding or organizing the business or enterprise of another person.

161.     Each defendant identified has either acting alone or in concert with another person, taken initiative in founding or organizing the business or enterprise of each of the plaintiffs.

162.     Under the Securities Act and Exchange Act a promoter is jointly and severally liable to a plaintiff for the unlawful act of another promoter which violates securities regulations.

163.     By reason of the foregoing, the defendants directly violated provisions of federal securities statutes as outlined above concerning the unlawful sale of unregistered securities using interstate commerce and have harmed the plaintiffs in the amount of their principal investment as follows:

   a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

   b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

   c.   Kamberly Webb in the principal amount of $50,000.00; and

   d.   Louise Webb in the principal amount of $20,000.00.

164.     By reason of the foregoing, the defendants have knowingly and directly violated provisions of federal securities statutes as outlined above concerning the unlawful sale of unregistered securities using interstate commerce and have additionally harmed the plaintiffs by causing them to incur costs and attorney fees associated with this proceeding and loss of interest.

## **COUNT II: UTAH SECURITIES VIOLATIONS**

### **(All Defendants)**

165.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 164 as set forth herein.

166.     The defendants have engaged in the unlawful offer, sale and promotion of unregistered securities in violation of the Utah Uniform Securities Act ("UUSA")

167.     The defendants have engaged in the unlawful offering, sale and promotion of unregistered securities using fraudulent misrepresentations, misstatements of material facts, and omissions of material facts using means of interstate commerce in violation of the Utah Uniform Securities Act ("UUSA") and rules promulgated by the Utah Division of Securities ("UDS").

**(Security)**

168.     Under the UUSA and rules promulgated by the UDS, a "security" among other things means an investment transaction where a profit expectation to come from the managerial efforts of a third party exists. Further under the UUSA, an interest in a limited liability company also constitutes a security. The investments promoted, offered and sold to the plaintiffs by the defendants gave rise to a profit expectation to come from the defendants' managerial efforts and an interest in a limited liability company constituting a "security" as this term is defined and applied under the UUSA and rules promulgated by the UDS.

169.     The defendants promoted, offered and sold to the plaintiffs investment interests in Fannie Mae REO pools to be managed by the defendants and further promoted, offered and sold stock, ownership interests, in JDK, The Companies and REIC constituting a "security" pursuant to U.C.A. 1953 § 61-1-1, *et seq.*

**(Fraudulent Statements; Misstatements of Material Fact; Omissions of Material Fact)**

170.     Under the UUSA, it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to (1) employ any device, scheme or artifice to defraud; (2) make any untrue statement of material fact or omit a statement of material fact

necessary to make the statement not misleading; or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. *E.g., id.*

171.     Further under the UUSA, it is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, to employ any device, scheme, or artifice to defraud the other person or engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person. *E.g., id.*

172.     The defendants have violated the UUSA by employing fraudulent and deceptive devices, offered fraudulent misrepresentations, offered material misstatements of fact and omitted material fact, making untrue statements concerning value in association with the promotion, offer and sale of securities within Utah.

173.     The defendants have further violated the UUSA by omitting to disclose material facts in association with the promotion, offer and sale of securities within Utah. The plaintiffs incorporate by reference the defendants' misrepresentations and misstatements and omissions of material facts in paragraphs 149, 153 and 154 herein as evidence of the defendants' fraudulent and deceptive devices, fraudulent misrepresentations, material misstatements and material omissions in violation of the UUSA. Such misrepresentations and misstatements by the defendants were made knowingly, intentionally or with reason to know of such falsity and further made with the intent to deceive the plaintiffs thereby inducing them to enter into unregistered fraudulent investment transactions.

174.     By accepting consideration for the investment(s) resulting from their abundant false representations, omissions of material fact and scheme to defraud the Investors as discussed previously herein, the defendants further violated the UUSA.

**(Failure to Register)**

175.     The UUSA requires an issuer of a security promoted, offered or sold in Utah to file a registration statement prior to the promotion, offer and sale of a security to the public. *E.g., id.*

176.     Under the UUSA, a party claiming an exemption has the burden of proving the claimed exemption applies.

177.     The defendants identified have promoted, offered and sold securities to the plaintiffs in Utah.

178.     The defendants identified have failed to file any registration statements concerning the securities promoted, offered and sold to the plaintiffs.

179.     The defendants' failure to file any registration statements constitutes a violation of the UUSA.

**(Promoters)**

180.     The defendants identified are considered "promoters" under the UUSA which define a "promoter" as an individual who acting alone or in concert with another person, takes initiative in founding or organizing the business or enterprise of another person.

181.     Each defendant identified has either acting alone or in concert with another person, taken initiative in founding or organizing the business or enterprise of each of the plaintiffs.

182.     Under the UUSA a promoter is jointly and severally liable to a plaintiff for the unlawful act of another promoter which violates securities regulations.

183.     By reason of the foregoing, the defendants directly violated provisions of the UUSA concerning the unlawful sale of unregistered securities in Utah and have harmed the plaintiffs in the amount of their principal investment as follows:

      a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.  Kamberly Webb in the principal amount of $50,000.00; and

      d.  Louise Webb in the principal amount of $20,000.00.

184.     By reason of the foregoing, the defendants directly violated provisions of the UUSA concerning the unlawful sale of unregistered securities in Utah and have additionally harmed the plaintiffs by causing them to incur costs and attorney fees associated with this proceeding and the loss of interest.

## COUNT III: JOINT VENTURE

### (All Defendants)

185.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 184 as set forth herein.

186.     The defendants formed and engaged in a joint venture enterprise relating to the offer, sale, and promotion of investments offered to the plaintiffs by the defendants and are therefore jointly and severally liable for the unlawful acts of each joint venture member.

187.     Each of the defendant companies are commonly owned and operated by Krohn and Earl and affiliate entities under REIC and The Companies. Each of the business defendants are commonly funded, are housed in the same common physical location, comingle funds, have

the same executives, officers, employees and operate under the brand identity of REIC towards the shared objective of acquiring investor funds, purchasing assets using investor funds, and managing, transferring and disposing of assets acquired through the plaintiffs' investment funds.

188. As outlined hereinabove, each individual and entity defendant materially and actively assisted in offering, selling and promoting the REO Investment and The Companies investment to the plaintiffs by promoting, offering, and selling unregistered securities the plaintiffs and/or assisting in the management, disposal or transfer of the assets purchased using the plaintiffs' investment funds.

189. An express or implied agreement exists among the individual and entity defendants concerning the offering, selling and promoting of the REO Investment, 2008 Gold Offering, 2nd 2008 REO Offering the JDK conversion offered by the defendants to the plaintiffs.

190. A common purpose of offering, selling and promoting securities and investments to the plaintiffs is carried out by the defendants.

191. A community of pecuniary interests exists among the defendants concerning the offering, selling and promoting investments and securities offered by the defendants to the plaintiffs. Each of the defendants are compensated or receive funds as a result of the unlawful offer, promotion and sale of unregistered securities to the defendants and management, disposal and transfer of assets purchased using the plaintiffs' investment funds.

192. An equal right to voice direction in the enterprise exists which gave an equal right of control among the defendants concerning the offering, selling and promoting the REO Investment, 2008 Gold Offering, 2nd REO Offering and The Companies investment to the plaintiffs. Krohn and Earl are the common and equal owners of each of the entity defendants.

193.     Each of the defendants profited either directly or indirectly in the promotion, offer and sale of the REO Investment and The Companies investment to the plaintiffs.

194.     By reason of the foregoing, the defendants formed a joint venture concerning the offering, selling and promoting investments and securities offered by the defendants to the Investors. As such, each of the defendants as members of a joint venture are jointly and severally liable for the unlawful acts of any other joint venture member.

195.     By reason of the foregoing, the defendants' actions as a joint venture concerning the offering, selling and promoting investments and securities offered by the defendants to the plaintiffs have harmed the plaintiffs in the amount of their principal investment to the defendants joint venture enterprise as follows:

    a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.   Kamberly Webb in the principal amount of $50,000.00; and

    d.   Louise Webb in the principal amount of $20,000.00.

196.     By reason of the foregoing, the defendants' actions as a joint venture concerning the offering, selling and promoting investments and securities offered by the defendants to the Investors have additionally harmed the plaintiffs by causing them to incur costs and attorney fees associated with this proceeding and the loss of interest.

## <u>COUNT IV: CIVIL CONSPIRACY</u>

### (All Defendants)

197.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 196 as set forth herein.

198.     The defendants (1) consisting of two or more individuals or entities; (2) with the objective of inducing the plaintiffs and other investors to enter into various investment transactions; (3) with a meeting of the minds on the intended investment transactions; (4) in which occurred one or more unlawful overt acts, including but not limited to, violations of the Securities Act, Exchange Act, the UUSA, fraud, negligence, and conversion; and (5) which actions are the proximate cause of damages to the plaintiffs through losses of their investment monies.

199.     Each of the defendant companies are commonly owned and operated by Krohn and Earl and affiliate entities under REIC and The Companies. Each of the business defendants are commonly funded, commingle funds, are housed the same common physical location, comingle funds, have the same executives, officers, employees and operate under the brand identity of REIC.

200.     Each defendant, including Krohn and Earl, have acted with the common goal and purpose of promoting, offering and selling the REO Investment, 2008 Gold Offering, 2008 2nd REO Offering and The Companies investment to the plaintiffs and managing, disposing and transferring the assets purchased using the plaintiffs' investment funds.

201.     The common purpose of promotion, offer and sale of unregistered securities to the public and managing, disposing and transferring the assets purchased by investor funds is expressly understood and actively pursued by each defendant.

202.     In the course of pursuing the common purpose of investment promotion to the plaintiffs and public in general, the defendants have engaged in misrepresentations, misstates and omissions of material facts in violation of federal and/or state laws.

203.     As a result of the foregoing, the defendants have formed and engaged in a civil conspiracy to promote, offer and sell unregistered securities to the plaintiffs and general public.

204.     By reason of the foregoing, the defendants' civil conspiracy has harmed the plaintiffs in the amount of their principal investment as follows:

      a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.   Kamberly Webb in the principal amount of $50,000.00; and

      d.   Louise Webb in the principal amount of $20,000.00.

205.     By reason of the foregoing, the defendants' civil conspiracy has harmed the plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

## COUNT V: FRAUDULENT INDUCEMENT

### (All Defendants)

206.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 205 as set forth herein.

207.     Based on the foregoing facts incorporated herein, the defendants, Krohn and Earl, individually and acting in their capacities as managers and owners of REIC, fraudulently induced the plaintiffs concerning the offer, sale and promotion of the REO Investment and The Companies offered by the defendants.

208.     As previously documented herein, Krohn and Earl made numerous fraudulent misrepresentations and misstatements and omissions of material fact with the intent to induce the plaintiffs to invest and purchase an investment interest in the REO Investment and The Companies offered by the defendants.

209.    In particular, the plaintiffs incorporate by reference the defendants' representations and omissions as contained in paragraphs 149, 153 and 154 herein as evidence of the defendants' misrepresentations, misstatements and material omissions.

210.    Such misrepresentation, misstatements and omissions by the defendants were made knowingly or with reason to know of the falsity and further made with the intent to deceive the plaintiffs thereby inducing them to enter into unregistered investment transactions.

211.    The plaintiffs relied on the defendants' numerous fraudulent misrepresentations and omissions of material fact as a basis for making their investment in the securities offered by the defendants to the plaintiffs. The other defendants, by virtue of respondeat superior, with knowledge or sanctioning Krohn and Earl's fraudulent inducement are vicariously liable.

212.    By reason of the foregoing, the defendants' fraudulent misrepresentations, misstatements and omissions of material facts have harmed and defrauded the plaintiffs in the amount of their principal investment as follows:

    a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.  Kamberly Webb in the principal amount of $50,000.00; and

    d.  Louise Webb in the principal amount of $20,000.00.

213.    By reason of the foregoing, the defendants' fraudulent misrepresentations, misstatements and omissions of material facts have harmed and defrauded the plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interest.

## COUNT VI: CONVERSION

### (All Defendants)

Amended Complaint

214.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 213 as set forth herein.

215.     The defendants have deprived the plaintiffs' from their money in a manner constituting a permanent deprivation of property without an exchange of adequate consideration.

216.     Throughout April 2008, the plaintiffs individually delivered funds to the defendants as follows:

      a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.  Kamberly Webb in the principal amount of $50,000.00; and

      d.  Louise Webb in the principal amount of $20,000.00.

217.     The defendants have failed, refused and neglected to return the plaintiffs' monies as agreed or requested.

218.     The defendants' failure, refusal and neglect to return the plaintiffs' monies constitutes conversion.

219.     By reason of the foregoing, the defendants' conversion has harmed the plaintiffs in the amount of their principal investment as follows:

      a.  Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.  Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.  Kamberly Webb in the principal amount of $50,000.00; and

      d.  Louise Webb in the principal amount of $20,000.00.

220.     By reason of the foregoing, the defendants' conversion has harmed the plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

## COUNT VII: ALTER EGO/PIERCE CORPORATE VEIL

### (All Defendants)

221.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 221 as set forth herein.

222.     Each of the defendant companies are commonly owned and operated by Krohn and Earl and affiliate entities under REIC and The Companies. Each of the business defendants are commonly funded, are housed the same common physical location, comingle funds, have the same employees and operate under the brand identity of REIC.

223.     Krohn, Earl and REIC are the owners and controlling shareholders of the other corporate defendants. The unity of interest and ownership of Krohn, Earl and REIC is such that there is no separation between the defendants' personal and the corporate entities. As a result, the observance of the corporate form of the businesses being other than Krohn, Earl, and REIC's alter egos would sanction fraud, promote injustice and cause an inequitable result.

224.     Starting in 2009, the defendants have commingled funds and used corporate funds to pay for personal expenditures of Krohn and/or Earl.

225.     Each of the business entities at the time of formation were undercapitalized in relation to the financial needs.

226.     As such, each of the defendants are jointly and severally liable to the plaintiffs for the unlawful conduct of each co-defendant, their respective owners, shareholders, managers and agents as outlined herein.

Amended Complaint

## COUNT VIII: NEGLIGENCE & RECKLESSNESS

### (All Defendants)

227.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 226 as set forth herein.

228.     The defendants owed the plaintiffs a duty of care concerning the prudent management of their investments.

229.     The defendants failed to exercise the requisite duty of care owed to the plaintiffs.

230.     The defendants failure to exercise care proximately and actually caused the plaintiffs damages.

231.     As a result of the foregoing, the defendants have committed negligence.

232.     By reason of the foregoing, the defendants' negligence has harmed the plaintiffs in the amount of their principal investment as follows:

      a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

      b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

      c.   Kamberly Webb in the principal amount of $50,000.00; and

      d.   Louise Webb in the principal amount of $20,000.00.

233.     By reason of the foregoing, the defendants' negligence has harmed the plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

## COUNT IX: BREACH OF FIDUCIARY DUTY

### (All Defendants)

234.     The plaintiffs hereby incorporate and re-allege the facts and allegations contained in paragraphs 1 through 233 as set forth herein.

235.     The defendants acted in a fiduciary capacity over the plaintiffs' property, assets and investment interests.

236.     The defendants have acted recklessly, negligently and failed to exercise the requisite duty of care owed to the plaintiffs.

237.     The defendants' recklessness, negligence and failure to exercise care proximately and actually caused the plaintiffs damages.

238.     As a result of the foregoing, the defendants have breached their fiduciary duty.

239.     By reason of the foregoing, the defendants' breach of fiduciary duty has harmed the plaintiffs in the amount of their principal investment as follows:

    a.   Travis Webb and Kristy Webb in the principal amount of $125,000.00;

    b.   Terry Webb and Kristie Webb in the principal amount of $100,000.00;

    c.   Kamberly Webb in the principal amount of $50,000.00; and

    d.   Louise Webb in the principal amount of $20,000.00.

240.     By reason of the foregoing, the defendants' breach of fiduciary duty has harmed the plaintiffs further causing them to incur costs and attorney fees associated with this proceeding and the loss of interests.

PRAYER FOR RELIEF

WHEREFORE, the plaintiffs are entitled to and pray for relief in the principal amount of no less than $295,000, pre and post judgment interest no less than 12% per annum from the date of investment, punitive damages due to the defendants' willful and negligent conduct, reasonable attorney fees and costs of this action.

DATED AND SIGNED this 19th day of September, 2011.

JOHNSTUN LAW, LLC

/s/Aaron K. Johnstun
Aaron K. Johnstun
*Attorney for Plaintiffs/*
*Defrauded Investors*

Amended Complaint